69 N.J. Super. 1 (1961)
173 A.2d 430
CHARLES L. MOORE, JR., ET AL., PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
BRIDGEWATER TOWNSHIP, A MUNICIPAL CORPORATION OF NEW JERSEY AND WARREN TOWNSHIP, A MUNICIPAL CORPORATION OF NEW JERSEY, ET ALS., DEFENDANTS-RESPONDENTS, AND DOCK WATCH PIT & QUARRY, INC., A CORPORATION OF NEW JERSEY, DOCK WATCH QUARRY PIT, INC., A CORPORATION OF NEW JERSEY, HARRY E. VON OSTEN, ET ALS., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 1961.
Decided June 8, 1961.
*3 Before Judges GOLDMANN, FOLEY and HALPERN.
Mr. Alfred C. Clapp argued the cause for plaintiffs-appellants and cross-respondents (Messrs. Hetfield & Hetfield, attorneys; Mr. George F. Hetfield, Mr. Joseph I. Bedell and Messrs. Clapp & Eisenberg, of counsel).
*4 Mr. Charles A. Reid, Jr. argued the cause for defendant-respondent, Bridgewater Township.
Mr. James W. Hurley argued the cause for defendant-respondent, Warren Township.
Mr. Jacques S. Lederman argued the cause for all defendants-respondents and cross-appellants.
The opinion of the court was delivered by HALPERN, J.S.C. (temporarily assigned).
This action in lieu of prerogative writ was instituted by plaintiffs, as residents and taxpayers of Warren and Bridgewater Townships, in Somerset County, seeking to restrain the quarry defendants, Dock Watch Quarry Pit, Inc., Harry E. Von Osten, Edward Mundock and John W. Mondak, from operating a stone quarry on the theory that it was a nuisance; and to compel Warren and Bridgewater to enforce their zoning ordinances against the use of the quarry defendants' premises as a stone quarry. After a full hearing on the merits, including an inspection of the premises by the trial judge, he rendered an opinion, upon which a judgment was entered, wherein he determined that the quarry defendants had a prior nonconforming use to operate the quarry in Warren and Bridgewater; that the quarry operation, as conducted, was not a nuisance, and could be continued; that mandamus would not lie against the townships because there was no violation of their ordinances; but he limited the hours of the quarry operations from 8 A.M. to 4:30 P.M. on weekdays, and prohibited work on Saturdays, Sundays and legal holidays.
The plaintiffs appeal from this judgment (except so much thereof as orders the quarry defendants to discontinue the use of their lands lying to the east of Dock Watch Hollow Road). The quarry defendants cross-appeal from so much of the judgment limiting their hours and periods of operation.
*5 The issues presented for decision by this appeal and cross-appeal are:
(1) How much of the quarry's 20.47 acres of land are in Warren and how much in Bridgewater?
(2) May the quarry defendants operate the quarry in Warren and Bridgewater as a nonconforming use, and, if so, have they unlawfully extended and intensified the permitted use?
(3) Have the quarry defendants violated the townships' building and structure ordinances by utilizing larger and modern equipment and structures?
(4) Are the plaintiffs guilty of laches?
(5) Do the quarry operations amount to a nuisance and did the trial judge properly limit the hours and days for quarry operations?
Before deciding these issues, a summary of the facts which the trial judge could properly find from the testimony, exhibits and his inspection of the quarry property, follows:
In 1926 the defendant, Von Osten, came into possession of a tract of mountain land consisting of 20.47 acres; 6.06 acres thereof is located in Warren and 14.41 acres in Bridgewater. On December 31, 1946 he acquired title thereto. The tract is located on the second mountain of the Watchung chain and lies north of Washington Valley Road and mostly west of Dock Watch Hollow Road. Its lowest point at the brook is 300 feet above sea level, and it rises to a point about 600 feet above sea level. Washington Valley Road runs along a valley, for about nine miles, between the first and second Watchung Mountains, and extends from Pluckemin, in Bedminster Township, to the Borough of Watchung. Dock Watch Hollow Road extends northerly from Washington Valley Road and cuts across a small portion of the easterly end of the Von Osten tract. Von Osten lived in an old house situated on the west side of Dock Watch Hollow Road. A small area of the property near the house has been cleared and leveled, and practically all of it comprises a sheer cliff of rock, with tree growth thereon, which rises *6 almost perpendicularly from the leveled portion. The topography of the property makes it impractical, if not impossible, for residential or agricultural use, and its highest use is that of a quarry. The tract contained a unique deposit of commercially usable rock from which an estimated six million tons were obtainable without blasting. In the early 1930's there were few, if any, residences near the property. In fact, even today, there are no residences for miles on the same level with the Von Osten tract on the second mountain. In recent years homes have been built along Washington Valley Road and some home development south and east of the quarry property toward Washington Valley Road has taken place. The locale however is still essentially a rural mountain area. During 1930 Von Osten had a geological survey made and, realizing he had a valuable natural resource, commenced to exploit it despite his limited finances. In 1931 and 1932 he started to "break the mountain down" and to quarry stone, in a small way, at a point in Warren near his house. He sold the stone so obtained and tried to get financial support from others to develop this business. He marked off the boundaries of the entire tract by erecting a fence which enclosed three sides of the property; the fourth side had a brook for a natural boundary. He continued his digging and quarrying, using a stone crusher and other equipment for that purpose, from 1931 to about 1949, continuing into the mountain from his starting point in Warren near his house. While he did some digging and stone removing on a portion of his Bridgewater land, such was abandoned prior to 1950, but the operation from the Warren side was continuous. During these years he slowly, but steadily, increased his quarrying operations. In the early 1940's he had surveys made to more accurately determine the quality and quantity of the stone on the entire tract. He had test holes made "all over the acreage on top of the hill." He hired others to help him clear trees in the area being quarried. He continually sold stone to masons, friends, neighbors and *7 construction contractors. In 1947 he entered into a written contract with one Roger Dealaman giving Dealaman the exclusive right to remove dirt from any part of the entire tract.
On November 2, 1937 Bridgewater adopted its building and structure ordinance, and on August 28, 1950 it adopted its land use ordinance. On February 2, 1948 Warren adopted its building and structure ordinance, and on May 5, 1952 adopted its land use ordinance. Warren's land use ordinance classified Von Osten's property as rural; and Bridgewater's land use ordinance classified it as residential. Quarrying on Von Osten's land was forbidden under both ordinances.
Despite the passage of these ordinances Von Osten continued his operations without objection or hindrance from either township until sometime in 1952. In May 1950 Von Osten entered into a written contract with Roger Dealaman and Edward Mundock for the digging and removal of all dirt, stone and rock, from the entire tract for a 20-year period, and gave them first refusal to purchase the entire tract. The lessees commercially operated the quarry under this lease. In February 1951 Von Osten entered into a written contract with Joseph Mondak, John W. Mondak and Edward Mundock for the digging and removal of all dirt, stone and rock from practically all of his land for a 20-year period; the operations to begin and continue at the site near the "Homestead area." These lessees continued to commercially operate the quarry. In July 1954 the lessees assigned their rights to Dock Watch Pit & Quarry, Inc., which corporation thereafter continued the quarry operation. In September 1956 Von Osten, Edward Mundock and John W. Mondak formed a corporation known as Dock Watch Quarry Pit, Inc. to dig, quarry and sell stone, etc. This corporation is presently operating the quarry business.
Sometime in 1952, residents in the area began complaining of the quarrying operations to the officials of Warren and Bridgewater. This resulted in the development of a strange *8 and unusual situation. Both townships refused or delayed taking any affirmative action, each contending that the Von Osten property was not located in its township. The answer filed by each township in this suit denied that the Von Osten property was within its respective boundaries. The townships took this position despite the fact that for years prior to the institution of this suit they each levied and collected taxes on portions of the property. The manner in which the taxes were levied only confuses the picture but it is briefly mentioned to show the inconsistency of the positions taken by the townships. It is obvious that both townships, for reasons best known to themselves, wanted no part of the quarry. Each township assessed two acres of the land for about 20 years. From 1949 to 1958 Warren assessed nine acres of the quarry land. In 1954 Bridgewater adopted a new tax map in which it placed 14.41 acres of the quarry land in Bridgewater and the balance of 6.06 acres in Warren. Despite this fact, Bridgewater has also been assessing the quarry defendants' realty, personal property and equipment, although such personalty was located in Warren. Warren's new proposed tax map places all of the Von Osten property in Bridgewater Township. This attitude, on the part of both townships, has only served to muddle the situation and to create uncertainty and confusion in the minds of all interested parties. For this reason the quarry defendants were unable to get zoning relief from either township.
When pressure by citizens intensified in the early part of 1952, Bridgewater's engineer and its building inspector examined the quarry site. On February 13, 1952 they reported, in writing, to the Township Committee that the quarry was located entirely in Warren. In June 1952, upon request of the Bridgewater Township Committee, its engineer drew a sketch of these conclusions. Meanwhile the quarry defendants continued their quarrying operations without molestation. In 1958, because of complaints being made, these Bridgewater officials made a further investigation of the quarry property, took pictures, prepared a map and *9 reported to the Township Committee that quarrying had continued in Warren but was now getting closer to the Bridgewater line. In 1959, after this suit was filed, they made another examination and reported that the quarry operations were now about 150 feet within the Bridgewater line.
As the result of complaints made by residents of Warren to the Warren Township Committee it directed its attorney to investigate and report on the situation. The attorney, after a thorough investigation, reported, in writing, to the Committee on February 9, 1954, that Von Osten had a nonconforming use in Warren, and could not be prevented from continuing it.
With these facts as a backdrop we consider the issues presented, enlarging on the facts where necessary under the separate points covered.

BOUNDARY DISPUTE.
To the extent necessary for this decision, we have concluded that 14.41 acres of the Von Osten tract are located in Bridgewater; and 6.06 acres thereof are in Warren. There were ample proofs in the record to justify this determination and we concur therein. We have been asked by plaintiffs, in their briefs, to compel Bridgewater and Warren to determine and fix their boundary line. Since this issue and such relief were not presented by the pleadings, or tried below, we take no affirmative action thereon. The parties, however, are not without a remedy. See N.J.S.A. 40:18-14, et seq.

NONCONFORMING USE AND ITS EXTENT.
At the outset, we wish to make it clear that since the Von Osten land is a single tract lying in Warren and Bridgewater Townships, it is affected by the zoning ordinances of both townships.
*10 The plaintiffs proved, and it was admitted by the quarry defendants, that when this suit was started, quarrying was being done on the Von Osten lands contrary to the permitted uses in the present zoning ordinances of both townships. This cast upon the quarry defendants the burden of establishing that such use, though nonconforming, nevertheless existed at the time of the passage of the townships' ordinances. Heagen v. Borough of Allendale, 42 N.J. Super. 472 (App. Div. 1956).
The plaintiffs, in their brief, in effect admit that the trial judge could have found from the proofs that a nonconforming use existed for the two-acre "Homestead Tract" in Warren. They argue however that such quarrying be limited within this two-acre tract; and that such quarrying be done only by means of the equipment and structures utilized on the date of the adoption of the applicable zoning ordinances.
The proofs in this case are conclusive that Von Osten and his lessees were quarrying stone on the Warren end of the Von Osten lands, at the two-acre Homestead site, long before the Warren and Bridgewater land use ordinances went into effect. It remains for us to determine, in the first instance, whether such nonconforming use must be limited to the area where the operations were then taking place, or whether it may be continued and extended to all, or other portions, of the tract.
The applicable statute is R.S. 40:55-48 and it provides:
"Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the building so occupied and any such structure may be restored or repaired in the event of partial destruction thereof."
This statute has existed, without change, since its original adoption in 1928. Our courts have consistently determined, and we are today committed to the philosophy, that while nonconforming uses may be continued as of right they are to be restricted, and may not be enlarged as of right, except where the enlargement is insubstantial or where a variance *11 therefor has been granted. Grundlehner v. Dangler, 29 N.J. 256 (1959).
The thrust of plaintiffs' arguments on this point is that only the nonconforming use existing at the time of the enactment of the ordinance may be continued upon the lot as then occupied, Ranney v. Istituto Pontificio Delle Maestre Filippini, 20 N.J. 189 (1955); that the statute protects the use occupying the land and does not deal in mere intentions of the owner, Martin v. Cestone, 33 N.J. Super. 267 (App. Div. 1954); that the criterion is whether the incipient use manifestly implies an appropriation of the entire parcel prior to the adoption of the restrictive ordinance, Gross v. Allan, 37 N.J. Super. 262 (App. Div. 1955); and that the statutory expression, "existing use," should be interpreted to mean that there was a manifest use of the entire parcel so that the neighborhood is aware that the whole parcel has been appropriated to the operation of a quarry. Appeal of Haller Baking Co., 295 Pa. 257, 145 A. 77 (Sup. Ct. 1928).
It is difficult, if not impossible, to use such criteria or to equate the reasoning for the decisions in the New Jersey cases cited with the instant case. We must not lose sight of the fact that the instant case deals with the removal from land of a natural resource or a diminishing asset, as distinguished from a structure placed upon land or some use made by the owner upon his land. This opinion, of necessity, must be concerned and limited only to its own facts dealing with a diminishing asset.
In Martin v. Cestone, supra, the only issue before the court was whether the owner violated the zoning ordinance by storing his heavy equipment on four separate but contiguous lots with a total frontage of 115 feet, when at the time of the enactment of the restrictive ordinance he was admittedly using only one of the lots for such purpose with a frontage of 53 feet. The court, in deciding against the owner, predicated its decision upon the fact that the record before it did not show that the owner, by his actions, *12 intended to use all four lots when the restrictive ordinance was adopted.
In Gross v. Allan, supra, the only issue before the court was whether the owner was entitled to a permit to sell used cars from his gas station premises in violation of the existing ordinance because he had at some time (presumably before the passage of the ordinance) displayed a single car for sale on his gas station premises. The court held such use not to have been nonconforming, citing amongst other cases Martin v. Cestone, supra, and then said:
"The criterion is whether the nature of the incipient nonconforming use, in the light of the character and adaptability to such use of the entire parcel, manifestly implies an appropriation of the entirety to such use prior to the adoption of the restrictive ordinance."
It is vital to our decision that we note at this point that the court in Martin and in Gross made mention of the case of Lamb v. A.D. McKee, Inc., 10 N.J. Misc. 649 (Sup. Ct. 1932). The court distinguished Lamb from its cases and, in Martin, the court quoted from Burmore Co. v. Smith, 124 N.J.L. 541 (E. & A. 1940) and Town of Billerica v. Quinn, 320 Mass. 687, 71 N.E.2d 235 (Sup. Jud. Ct. 1947), which cases also distinguished Lamb.
In Lamb, the defendant owned a ten acre tract from which he was excavating sand and gravel, one acre of which was being operated on the date of the enactment of the restrictive ordinance. When the defendant continued to excavate on other portions of the tract he was convicted for a violation under the ordinance. The court reversed and said:
"We think the tract as a whole was used for excavating purposes even though only a part of it was actually being dug. Under prosecutor's reasoning a land owner would be entitled to continue a previous nonconforming use only on the precise spot where it was being done. We think that is not so, and was not the intention of the Legislature * * *. We think that the tract was a single unit, and that it was put to a nonconforming use as a whole before the act * * * was passed."
*13 In Burmore Co. v. Smith, supra, the only question presented was whether the owner of a business building (nonforming) was entitled to enlarge it. The court denied him relief and in so doing said what plaintiffs now urge upon us in this case:
"The use which appellants made of their property at the time of the passage of the zoning ordinance is the authoritative standard for determining the use which they may continue to make of their property after the passage of the zoning ordinance. In other words, the nonconforming use must be the same both before and after the passage of the ordinance.
The holding in the cases of Frank J. Durkin Lumber Co. v. Fitzsimmons, 106 N.J.L. 183; 147 A. 555, and Lamb v. A.D. McKee, Inc., 10 N.J. Misc. 649, 160 A. 563, is not to the contrary. As pointed out in the Home Fuel Oil Co. v. Glen Rock case, supra ([118 N.J.L. 340] at p. 345), in the Durkin Lumber case the use of the lot (storing lumber thereon) was the same before and after the passage of the ordinance, and in the Lamb case the whole lot (10 acres) was used for the removal of sand and gravel, even though only a part (1 acre) of it was actually dug both before and after the passage of the zoning ordinance." (124 N.J.L., at p. 547)
This quotation from Burmore, dealing with Lamb, was again discussed in Martin v. Cestone, supra. At this point the Martin court used Town of Billerica v. Quinn, supra, to explain Lamb and said:
"The use dealt with in the Massachusetts case, namely, the removal of loam from a parcel of land, is referred to in the case as a type of use that cannot be continued without extending it; and it was said that conceivably a nonconforming use of such a character may exist, if there is to some extent a physical appropriation of the land to the use  some action taken on the land evidencing the appropriation."
The intimation of the court in Martin, from the above quotation, is that Lamb should be limited to situations in which there is physical evidence that the whole tract had been appropriated to the nonconforming use. This, too, is plaintiffs' argument in this case.
Whatever weight is given to Billerica should be considered in the light of the fact that in that case the owner, three *14 days before the restrictive ordinance became effective, stripped some topsoil from an area 30 to 35 feet wide. The issue before the court was whether the owner now could utilize 19 acres of his land for stripping of loam as a nonconforming use. The court decided against the owner because it was obvious that the owner's activities, three days before the effective date of the ordinance, were an attempt to "beat" the law. We must, therefore, keep these facts in mind when we consider what the court said in Billerica. Even in Billerica the court states that the owner might have a nonconforming use as to the whole 19 acres if the owner had:
"* * * devoted to the use by actual occupation of the land in a manner physically appropriating it to the use, as for example by means of structures, use for storage or ways, preparation of the ground, or even perhaps by fencing off the portion to be used, if the fencing had particular relation to the use." [320 Mass. 687, 71 N.E.2d 236.]
Plaintiffs contend that the quarry defendants do not have a nonconforming use beyond the two-acre Homestead tract because they have failed to meet the tests or standards laid down in Martin v. Cestone, Burmore Co. v. Smith, Gross v. Allan, and the cases therein cited. We cannot agree that these are the standards which must be met by the quarry defendants in this case, although, in fact, the court could have concluded from the testimony that all of them did exist. Our disagreement with the effect of these cases on the instant one does not mean that we disagree with the results in those cases.
The plaintiffs' argument points up two conflicting theories with respect to the expansion of nonconforming uses. The first theory is that the nonconforming use is restricted to the boundaries of the original tract, but that within these boundaries it must be allowed to increase by natural expansion. The second, and narrower theory, is that the nonconforming use is limited to the use as of the date of the enactment of the restrictive ordinance.
*15 As previously stated, New Jersey is committed to the narrower theory and the cases relied on by plaintiffs are to this effect. However, the New Jersey cases cited do not deal with a diminishing asset and we hold that in "diminishing asset" cases we should follow the lead taken in Lamb, and adopt the broader theory. Any other view would be unrealistic and of questionable constitutional validity. It is quite obvious that an owner intending to carry on a quarrying operation acquires more land than he thinks he will need so that he will not be a source of nuisance to his neighbors. For practical and economical reasons he must begin operations at one given point and continue from there to a point on his lands where his natural resource ends or at his boundary line. For the same reasons, it is not feasible for him to quarry at different locations at the same time. To attempt to apply the standards of Martin v. Cestone and Gross v. Allan to this kind of an operation presents many problems. When the court in Martin talks of "an existing use occupying the land," how can it be equated to a quarry operation unless you deal with the operator's intentions? When the court in Gross talks about the criterion being "whether the nature of the incipient nonconforming use, in the light of the character and adaptability to such use of the entire parcel, manifestly implies an appropriation of the entirety * * *," it is difficult to comprehend how a quarry operator would evidence such intent other than by continuing to quarry. If we adopt the standards suggested in Billerica we leave the door open for self-serving acts on the part of the operator to make out a case for an expandable nonconforming use even though he never really intended to proceed further with the operation. It is difficult, and also dangerous, to attempt to fix standards applicable in all cases; each case must be decided on its own facts.
In the instant case Von Osten and his lessees started quarrying stone in a small way as early as 1930. Without again repeating all the facts revealed by the testimony, exhibits and the trial judge's findings, as hereinbefore set forth, it *16 is clear that the entire 20.47 acres, excepting so much thereof lying on the east side of Dock Watch Hollow Road, were dedicated to the digging, quarrying and removal of dirt, stone and rock. Von Osten's outward manifestation of his intent, which is the criterion in Martin, Gross and Billerica, is here present, and we are not dealing with an owner's mere subjective intent. This nonconforming use extended to that portion of the entire 20.47 acres even though the principal quarrying was done in Warren Township. The use being nonconforming in both townships, it extends into both townships.
Our decision to adopt the broader theory, in this kind of a case, is in line with the better reasoned decisions of other jurisdictions. In fact, these foreign decisions rely upon our decision in Lamb to support their views. Because of the novelty and importance of the problem it appears worthwhile to discuss some of the cases. In Hawkins v. Talbot, 248 Minn. 549, 80 N.W.2d 863 (Sup. Ct. 1957) the defendant operated a gravel pit 175 feet, by 150 feet, by 6 feet deep, prior to the enactment of the restrictive ordinance. Thereafter he increased his operation over an area of about 240 feet, by 210 feet, by 8 1/2 feet. The court discusses the Billerica case, as well as the restrictive theory, and interprets the Minnesota ordinance which is more stringent than our statutes thusly:
"Even assuming that such a construction is not violative of constitutional protections of vested property rights, it is unwarranted under the language of the ordinance here involved. We are of the opinion that the phrase `occupy a greater area of land than that occupied by such use at the time of the adoption of this ordinance' should be interpreted, in the case of a diminishing asset, to mean all of that part of the owner's land which contains the particular asset, and not merely that area in which operations were actually being conducted at the time of the adoption of the ordinance. In other words, since the gravel here `occupied' a larger area than the part actually being mined at the time of the adoption of the ordinance, the entire area of the gravel bed could be used without constituting an unlawful extension of a nonconforming use.
A number of courts have adopted this view. For example, in *17 Lamb v. A.D. McKee * * * the court said: [quoting] * * *" (80 N.W.2d, at p. 866)
The author of the note in 102 U. Pa. L. Rev. 91 (1953) is of the opinion that the "diminishing asset" theory is merely another way of expressing the natural expansion theory. The author summarizes his views thusly:
"* * * Apparently under either the strict limitation or the natural expansion doctrine, insubstantial renovations or extensions are permissible, although even here strict limitations as to cubic footage have sometimes been imposed. When the existing use involves unimproved land, such as is the case with extraction, under the natural expansion theory the whole lot is considered to be in use from the beginning and operations may be extended accordingly. * * *" (Emphasis added)
Here again Lamb is cited by the author as authority for the emphasized portion of the quotation.
The Supreme Court of Illinois has recently approved the rationale of Hawkins. In County of Du Page v. Elmhurst-Chicago Stone Co., 18 Ill.2d 479, 165 N.E.2d 310, 313 (Sup. Ct. 1960) the defendant had a nonconforming use to quarry limestone. The issue was whether the defendant was to be limited to the portion actually in use on the date of the passage of the restrictive ordinance. The court adopted the broader theory and said:
"This is not the usual case of a business conducted within buildings, nor is the land held merely as a site or location whereon the enterprise can be conducted indefinitely with existing facilities. In a quarrying business the land itself is a material or resource. It constitutes a diminishing asset and is consumed in the very process of use. Under such facts, the ordinary concept of use, as applied in determining the existence of a nonconforming use, must yield to the realities of the business in question and the nature of its operations. We think that in cases of a diminishing asset the enterprise is `using' all that land which contains the particular asset and which constitutes an integral part of the operation, notwithstanding the fact that a particular portion may not yet be under actual excavation. It is in the very nature of such business that reserve areas be maintained which are left vacant or devoted to incidental uses until they are needed. Obviously it cannot operate over an entire tract at once."
*18 The Illinois court adopted the view that the increased land use in a quarrying operation is not an extension of the nonconforming use, but rather an integral part of the nonconforming use.
California has also recognized the fact that nonconforming quarrying cases create unique problems and must be treated differently from the run-of-the-mill situations. The court in McCaslin v. City of Monterey Park, 163 Cal. App.2d 339, 329 P.2d 522, 527 (D. Ct. App. 1958) stated its views thusly:
"* * * A mineral extractive operation is susceptible of use and has value only in the place where the resources are found, and once the minerals are extracted it cannot again be used for that purpose. `Quarry property is generally a one-use property. The rock must be quarried at the site where it exists, or not at all. An absolute prohibition, therefore, practically amounts to a taking of the property since it denies the owner the right to engage in the only business for which the land is fitted.' * * *."
We are aware of the fact that our Supreme Court considered the two divergent philosophies in Ranney v. Istituto Pontificio Delle Maestre Filippini, supra, and by a 4 to 3 decision again committed New Jersey to the view that nonconforming uses are to be restricted. We must remember, however, that in Ranney the court was considering a variance application to permit a parochial school, which was nonconforming, to expand its facilities by additional building construction. We do not view Ranney as committing us to this same philosophy in a "diminishing asset" case. Nor do we view it as reversing Lamb in this regard.
Much of the effective force of Ranney has been removed in the very recent case of Black v. Town of Montclair and Lacordaire School, 34 N.J. 105 (1961). Montclair's ordinance passed in 1937 permitted Lacordaire's property to be used as a school for less than 13 pupils. Lacordaire was nonconforming, having an enrollment of 54 pupils on the date of the enactment of the restrictive ordinance. These pupils, in 1937, utilized the first and second floors of the *19 main building located on a 3 1/2-acre tract. By 1958 the student body had increased to a point where 139 students utilized the first and second floors of the main building, and 96 students utilized a coach house on the premises to which, through the years, four classrooms had been added without a variance. In the summer of 1958 Lacordaire applied for, and was granted, a variance to construct a new school building on a portion of its 3 1/2 acres. The plaintiffs, residents and taxpayers of Montclair, appealed from a judgment of the Law Division affirming the action of Montclair's Board of Commissioners. Plaintiffs relied on Ranney, which they contended is on all fours with Lacordaire, to reverse the judgment below. The Supreme Court, in a unanimous opinion by Justice Jacobs, sustained the Law Division. The court significantly not only approved the increase and intensification of the expanded use of the main school building but also greatly weakened, if not actually overruled, portions of the decision in Ranney. Justice Jacobs in commenting upon appellants' reliance on Ranney and Moriarty v. Pozner, 21 N.J. 199 (1956), stated:
"Although these decisions are heavily relied upon by the appellants their authority here has been nullified by more recent opinions of this court." (citing cases)
In answer to appellants' further contention that Lacordaire's present use of the main building was not a valid nonconforming use because no proofs were offered to establish when the upper floors were first utilized for classrooms, Justice Jacobs swept it aside because it was not raised before the Board of Adjustment and the Law Division. He went on to say (34 N.J., at p. 117):
"Furthermore, we believe that it may fairly be inferred from the record that prior to the passage of Montclair's 1937 ordinance the main building in its entirety was considered as dedicated to school purposes and was used both for student classrooms and teachers' living quarters. At that time there were 54 students and although the zoning ordinance provided only for privately conducted schools *20 for less than 13 pupils, the school validly continued operations thereafter as a nonconforming use. The gradual increase in the number of attending students which necessitated internal changes in the classrooms and living quarters would not, under most of the precedents, be considered an unlawful extension of the nonconforming use. See Lamb v. A.D. McKee, Inc., 10 N.J. Misc. 649 (Sup. Ct. 1932); * * * [citing cases]. See also Martin v. Cestone, 33 N.J. Super. 267, 270 (App. Div. 1954); Gross v. Allan, 37 N.J. Super. 262, 272 (App. Div. 1955)."
It is significant that the court used Lamb as a "See" citation, and Martin and Gross as a "See also" citation. If anything, one must conclude that our Supreme Court has cleared the air as to the effect of Lamb, and has recognized that Martin and Gross are not in conflict with it.

STRUCTURES.
Plaintiffs contend the existing stone crushing plant, power house, fence, poles and wires are "structures" within the meaning of the Warren Township Building and Structure Ordinance of February 2, 1948. They further contend that as to any nonconforming use the quarry defendants have, they are limited to taking the stone and crushing it with a sledge hammer or the bucket of a power shovel. This argument is based upon their assertions that the Warren structures ordinance of 1948 governs and, therefore, only such equipment used by the quarry defendants on that date may be used in the future. They further argue that the use of new or larger equipment is also an unlawful extension of the nonconforming use and should be prohibited.
Plaintiffs' contentions on "structures" are difficult to treat with separately and will be considered together. At the outset we once again point out that the term "structures" has a wide variety of meanings and applications, and we will consider it only with respect to the facts in this case. It is quite obvious that the Legislature and the townships in question, when they referred to "structures," referred principally to buildings or appurtenances to realty.
*21 The building and structure ordinances of Warren and Bridgewater are more liberal toward nonconforming uses than R.S. 40:55-48. Section 2.02 of the Warren ordinance provides:
"any structure which is a Nonconforming Structure by reason of the nature of its use, may * * * be extended and, as extended, may continue to be devoted to the Nonconforming Use * * *."
Section IX-(h) of Bridgewater's ordinance also allows a structural extension to a nonconforming use but limits it to "25% of the cubical contents of the * * * buildings as existing at the time of the enactment of this ordinance * * *."
In construing the statute and ordinances the inescapable conclusion is that they were only intended to deal with buildings and appurtenances thereto. Any attempt to apply section IX-(h) of Bridgewater's ordinance to any other than a building is impossible. If we were to apply section 2.02 of the Warren ordinance to the structures the plaintiffs complain about, there would be no limitation, by ordinance, upon the quarry defendants as to the type or size of equipment utilized in their quarry operations. While this might well dispose of plaintiffs' contentions on structures, we prefer to consider it on a broader plane as it is applicable to a quarry operation.
The proofs justify the conclusion that in the early days of the quarry operation Von Osten utilized a sledge hammer and the bucket of a power shovel. He also used a stone crusher in 1931 but abandoned it before the Warren ordinance was enacted on February 2, 1948. In April 1952 a large stone crusher was used; and in 1956 it was replaced with another crushing plant. It is clear that the new equipment performed the same function as the old equipment, except that it did the work in a quieter, better and more efficient manner. In 1957 electric poles and wires were installed to bring in electricity to operate the crusher. A cinder block building was erected to replace an old one covering the well on the property; it now also contains *22 electric meters on the inside, and power transformers are attached on the outside. A fence was built around the transformer vault. Unquestionably there has been an increase in the intensity of the use, since greater quantities of stone products are now being removed than when the ordinances went into effect.
A structure has been broadly defined as "any production or piece of work, artificially built up or composed of parts and joined together in some definite manner." Hendryx Co. v. City of New Haven, 104 Conn. 632, 134 A. 77 (Sup. Ct. Err. 1926). Under this definition we hold that the stone crusher now in use by the quarry defendants is a structure. Wilbur v. City of Newton, 302 Mass. 38, 18 N.E.2d 365 (Sup. Jud. Ct. 1938).
We hold that the electric poles, and wires thereon, which are being used in connection with the quarry operation are also structures. Forbes v. Williamette Falls Electric Co., 19 Or. 61, 23 P. 670 (Sup. Ct. 1890); such items if used in connection with the conforming residence would not be a structure. See Wright v. Vogt, 7 N.J. 1 (1951).
We hold that the fence around the transformer vault is a structure. State v. Zumpano, 146 N.E.2d 871 (Ohio Ct. App. 1957).
Admittedly the cinder block building is a structure. Presently it serves as a replacement for a wooden well house; but in addition it houses the electric meters, and attached to its exterior are power transformers utilized in the quarrying operation.
Having decided that the quarry defendants have a valid nonconforming use to quarry stone from the 20.47 acre tract, we are now asked to hold that such can only be done by the same method and with the same structures as were in use on February 2, 1948. Once again we point out that it is difficult to equate a quarry operation and structures used in connection therewith, with the ordinary type of business venture done in a building or appurtenances attached to land. There are no New Jersey cases cited by *23 counsel, nor have we found any, covering "diminishing asset" cases as we are here confronted with. We therefore feel free to chart a new course, consistent with our zoning statutes and decisions.
While R.S. 40:55-48 has been construed strictly so as to restrict the enlargement of a nonconforming use, it clearly reveals the legislative intent that the use be permitted to go on so long as it is not changed. Let us assume an extreme situation where an owner is quarrying with only a pick and shovel, when an ordinance is passed making his operation nonconforming. Should we decide that thereafter the owner, his heirs or assigns, may only quarry with a pick and shovel? We have decided in the instant case that the right to quarry extends to the owner's entire tract because not to permit it would, in effect, end the operation. The same reasoning is applicable to the problem of structures. We are of the opinion that in a "diminishing asset" case the holder of the nonconforming use should be permitted to modernize his operation; and change, add to, or increase the size of his equipment (though deemed to be structures), even though this increases his output and intensifies the use; provided that by such action he does not change the original protected nonconforming use.
This doctrine has even been applied in other than "diminishing asset" situations. Thus modernization and use of more effective instrumentalities are the suggested rule in 8 McQuillan on Municipal Corporations (3d rev. ed. 1957), sec. 25.210, p. 525. Modernizing a service station was permitted in Lane v. Bigelow, 135 N.J.L. 195 (E. & A. 1946). A change from steam power to internal combustion power in a nonconforming ice plant was held not to be a change or extension of such use. Irby v. Panama Ice Co., 184 La. 1082, 168 So. 306 (Sup. Ct. 1936). Any other approach is tantamount to confiscation. Schaible v. Board of Adjustment of Millburn Tp., 134 N.J.L. 473 (Sup. Ct. 1946); Home Fuel Oil Co. of Ridgewood v. Bd. of Adjustment of Borough of Glen Rock, 5 N.J. Super. 63 (App. Div. 1949).
*24 In line with our views on structures in a "diminishing asset" case are several decisions of courts in other jurisdictions. In De Felice v. Zoning Board of Appeals of Town of East Haven, 130 Conn. 156, 32 A.2d 635, 147 A.L.R. 161 (Sup. Ct. Err. 1943), the plaintiff had a nonconforming use to remove sand from a sand pit on a 12 acre tract he owned. Originally he used only picks and shovels. Thereafter he used a steam shovel to remove sand. It was when he attempted to install a new wet sand classifier that the court stopped him because this structure by treating the sand made it a different use. The court said:
"* * * the fact that improved and more efficient instrumentalities are utilized in pursuit of the use does not exclude it from the category of an `existing use,' provided these are ordinarily and reasonably adapted to make that use available to the owner, and the original nature and purpose of the undertaking remain unchanged. * * * [citing cases]
Within the principles of these decisions the plaintiffs are entitled to use power shovels and other such equipment in the removal of sand from the twelve acre tract, pursuant to the exercise of their right to continue their nonconforming use of the land as a source of supply for sand. * * *" (32 A.2d, at p. 638)
The right to use newer and larger equipment was determined not to be an extension of the nonconforming use in Hawkins v. Talbot, supra, where the court held the utilization of a rock crusher was merely an improvement over the previous method used and did not constitute a change in the nature and purpose of the original use. See also Appeal of Haller Baking Co., supra; Borough of Cheswick v. Bechman, 352 Pa. 79, 42 A.2d 60 (Sup. Ct. 1945).
We, therefore, hold that the quarry defendants did not violate the building and structure ordinances of either Bridgewater or Warren by utilizing the new stone crusher. Since such equipment, or structure, cannot be used without electric power, the installation of the poles, wires, transformers, meters and fence was permitted accessory use. Since the cinder block building replaced the old *25 wooden well house, such replacement was permissible. The electric meters and power transformers are not in violation because they are accessory uses to the permitted quarrying operation. The allowance of a primary use generally authorizes all uses normally accessory, auxiliary or incidental thereto. Zahn v. Newark Bd. of Adjustment, 45 N.J. Super. 516, 521 (App. Div. 1957).

LACHES.
The trial judge did not pass upon the defense of laches but by way of dictum chastises the plaintiffs for not instituting their suit at an earlier date. The cross-appeal taken by the quarry defendants does not raise the laches question, so that it need not be considered by us. In any event, we find it inapplicable because the affirmative defense of laches, in a suit to compel a municipality to enforce its zoning ordinances, is not allowed except in the clearest and most compelling circumstances. Universal Holding Co. v. North Bergen Tp., 55 N.J. Super. 103 (App. Div. 1959).

NUISANCE AND INJUNCTION.
The complaint charged that the quarry operations were a nuisance and sought to enjoin such operations. Without reviewing all the testimony on this subject, it suffices to say that the trial judge's conclusion that the plaintiffs failed to prove the charge of nuisance was amply justified. Nevertheless, by his judgment entered in the cause, he restricted the hours and days for such quarry operations. The quarry defendants have cross-appealed from this portion of the judgment.
The trial judge, in his opinion, after concluding that plaintiffs failed to prove the existence of a nuisance found:
"I personally inspected the site and spent several hours walking over the plant, quarry property and neighborhood. I went 600 or 700 feet away from the plant to see if there was evidence of noise and dust. There was some noise but I noticed no dust and no vibration at the time I was there. There was no evidence of physical damage to any property.
*26 * * * In my opinion the noise was not such as would affect injuriously the health or comfort of ordinary people in the vicinity to an unreasonable extent. * * * I do not consider the truck traffic on Dock Watch Hollow Road to be a nuisance or to demand injunctive relief. Nevertheless, I feel that the quarry operation shall not be worked earlier than eight a.m. nor later than 4:30 p.m.; it should not be worked on Saturdays and Sundays and Holidays so that there can be no question of interfering with the sleep and rest and relaxation of the residents in the vicinity of the quarry. * * * Neither do I think that the evidence of depreciation of value was borne out. Many of the homes are more than 500 feet away and from my inspection the operation of the quarry did not result in the depreciation in value as testified to in this case. * * *"
No fact basis is referred to by the trial judge, nor have any reasons been set forth, for imposing the injunctive relief as required by R.R. 4:67-5. In fact, his fact findings call for a denial of such relief.
As stated by the court in Trisolini v. Meltsner, 23 N.J. Super. 204, 208 (App. Div. 1952):
"* * * injunction is an extraordinary remedy; * * * it should be used sparingly and only where the proven equities establish a clear need. 28 Am. Jur., Injunctions, sec. 3, p. 198. There is no power, the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, and which is more dangerous in a doubtful case, than the issuing of an injunction. * * * Not only should the right be clear, but the facts giving rise to the claim of right should be clear as well."
To the same effect are Lou Menges Organization v. North Jersey Quarry Co., 3 N.J. Super. 494 (Super. Ct. 1949); Benton v. Kernan, 130 N.J. Eq. 193 (E. & A. 1941); Dolan v. De Capua, 16 N.J. 599 (1954).
In the absence of the trial judge's finding the existence of either a nuisance, or the violation of some statute or ordinance, an injunction should not be imposed. See Texas Employers' Ins. Ass'n v. Whitaker, 274 S.W.2d 578 (Tex. Civ. App. 1954); Plassey v. S. Loewenstein & Son, 330 Mich. 525, 48 N.W.2d 126 (Sup. Ct. 1951); Menger v. Pass, 367 Pa. 432, 80 A.2d 702, 24 A.L.R.2d 562 (Sup. Ct. 1951).
The judgment below, except as herein modified, is affirmed.