142 N.J. Super. 103 (1976)
361 A.2d 12
DOCK WATCH HOLLOW QUARRY PIT, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
THE TOWNSHIP OF WARREN, DEFENDANT-APPELLANT AND CROSS-RESPONDENT AND THE TOWNSHIP OF BRIDGEWATER, DEFENDANT AND CROSS-RESPONDENT, AND THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 7, 1975.
Remanded April 23, 1975.
Reargued September 11, 1975.
Decided May 6, 1976.
*108 Before Judges MICHELS, MORGAN and MILMED.
Mr. J. Albert Mastro argued the cause for defendant-appellant and cross-respondent Township of Warren (Mr. Mastro, attorney; Mrs. Dolores A. Mastro on the brief).
Mr. Daniel F. O'Connell argued the cause for defendant and cross-respondent, Township of Bridgewater (Mr. William W. Lanigan. attorney).
*109 Mr. Frederick C. Mezey argued the cause for plaintiff-respondent and cross-appellant (Messrs. Mezey & Mezey, attorneys; Mr. Harmon H. Lookhoff on the brief).
Mr. Michael S. Bokar, Deputy Attorney General, argued the cause for defendant-respondent and cross-respondent State of New Jersey (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by MICHELS, P.J.A.D.
In this case we are called upon to consider the extent to which a municipality may regulate by ordinance adopted pursuant to the police power a previously declared nonconforming use of land.
Plaintiff Dock Watch Hollow Quarry Pit, Inc. (Dock Watch), the owner and operator of an open pit quarry located in Warren Township (township), brought the present action to invalidate an ordinance regulating quarries adopted by the township. Ordinance No. 69-8, as revised on September 19, 1974 by Ordinance No. 74-23[1], declared its purpose to be:
* * * the protection of persons and property and for the preservation of the public health, safety and welfare of the Township of Warren and its inhabitants and to insure that quarrying operations shall be conducted in such a manner as to create a minimum of annoyance from noise and dust to nearby owners or occupants of property, provide for the safety of persons, particularly children, and further to insure that the quarried area shall be suitably and reasonably rehabilitated after quarrying operations have been completed or otherwise terminated.

*110 I
A brief review of the factual context in which this appeal arises is helpful to the resolution of the many issues involved. The Dock Watch quarry is situated on approximately 20 acres of land. Quarrying has been conducted on the land since 1930, long before the adoption of the township's land use ordinance in 1952 in which quarrying on the land was forbidden. The quarry's status as a nonconforming use was declared, and the extent thereof defined, in prior litigation. See Moore v. Bridgewater Tp., 69 N.J. Super. 1 (App. Div. 1961). In that case the operators of the quarry were held entitled to extract traprock and shale from the approximately 20 acres comprising the quarry, as against the contention that the nonconforming use was restricted to that part of the land being quarried at the time the applicable zoning ordinances were adopted.
Following a plenary trial in the present case the trial judge made the following factual findings which do not seem to be seriously disputed and which find ample support in the record. The quarry is the only one in operation in Warren Township and has been conducted on the land in question since 1930. Prior to 1970 the location of the boundary line between Warren and Bridgewater Townships was in doubt, and this uncertainty included that portion thereof which passed through the quarry property. Moore v. Bridgewater Tp., supra, considered this problem and its manifestations at length and concluded from the evidence there adduced that approximately 14 acres of the quarry were located in Bridgewater and the remaining six acres in Warren Township. See 69 N.J. Super. at 9.
In the early spring of 1971 both Warren and Bridgewater Townships, in an apparent effort to solve the problem created by divided jurisdiction over the quarry, passed a resolution petitioning the State Legislature to enact special legislation redrawing the boundary line between the two townships in such a way as to include all of the quarry *111 within Warren Township. A notice of intention regarding the proposed legislation was published by both townships in a newspaper of general circulation in Somerset County. The resolutions were forwarded to the Legislature and special legislation was passed by both houses and signed into law by the Governor on June 30, 1971. Thereafter, the Dock Watch quarry was entirely in Warren Township and subject to the regulatory ordinance adopted in 1969, portions of which are the subject matter of this appeal.
Dock Watch's business is a competitive one. Its principal competitor is the larger and more extensive Houdaille operation in Bridgewater Township, approximately three miles distant from the Dock Watch quarry. Before the change in boundary most of the quarry was controlled by the Bridgewater ordinance so that both it and its major competitor operated under the same regulatory restrictions. Since the boundary change the quarry has come under the jurisdiction of the allegedly more restrictive Warren Township ordinance, and Dock Watch contends that it will be forced to operate at such a competitive disadvantage that it may be forced out of business if the challenged ordinances are upheld.
The quarry has an elevation of approximately 270 feet at its present floor, and its highest elevation is approximately 550 feet. At present the quarrying operation has not gone below the level of the adjoining roadway to any real extent, but a good portion of the mountain within the quarry property above the roadway level has already been removed during more than 40 years of quarrying. The quarry is bounded by a brook and roadway on the easterly side thereof; the remaining three boundaries are in the portions of the mountain which have not yet been removed.
The general procedure used for obtaining materials from this open-pit type quarry is by means of drilling, blasting, crushing the dislodged material, sorting the crushed materials through a scalping screen, carrying it on conveyor belts to the storage areas, and finally loading it into trucks *112 for delivery to consumers. While most of the material is traprock, there are also deposits of shale, a softer form of rock which is mined by Dock Watch primarily for use as fill and which the trial judge found to have a retail value of $2 a ton. At the time of trial the traprock sold for between $2.50 and $3.50 a ton.
Two of the challenged provisions of the ordinance in question prohibit quarrying below the grade of the adjacent roadway and within a 50-foot buffer strip around the perimeter of the quarry property. The economic consequences to Dock Watch of the enforcement of these provisions were explored in extensive testimony during trial and the estimates thereof were subject to wide variation and considerable dispute. The trial judge found that the total value of the rock and shale deposits in the quarry, including that within the 50-foot buffer strip and that below grade to a depth of 150 feet, consisting of almost 20,000,000 tons, is approximately $50,000,000. The judge also found that deposits contained in the buffer area to grade are approximately 2,670,000 tons with a value of $2.50 a ton, or a total value of $6,700,000, and that the deposits outside the buffer area to grade are approximately 6,660,000 tons with a total value of $16,650,000. The deposits below grade to a depth of 150 feet, forbidden to be removed by the challenged ordinance, are approximately 10,287,000 tons with a value of almost $26,000,000; this valuation does not include any mining in the 50-foot buffer zone because of the necessity to bench and slope the area above grade.
The trial judge stressed the approximate nature of these figures and that the substantial dispute as to the value of the as yet unmined materials stemmed from the computation of the quantity of the available assets which could effectively, from both a legal and practical standpoint, be taken from the quarry. The township's expert stressed the legal requirements as well as the necessity for benching as the basis for his estimates, which were substantially less than those given by the quarry witnesses. For example, with *113 respect to the assets which could be extracted from the buffer strip to grade, the township's estimate was about one-third of that provided by the quarry's principal witness. The trial judge found it unnecessary to make any precise factual determinations as to the extractable quantity of assets within the buffer zone and below grade because, accepting the testimony of either side, the quantity was substantial and the best estimate as to the amount thereof probably lay somewhere between the two offered estimates. He did, however, find that Dock Watch's total present investment in the quarry is about $2,000,000  $1,000,000 for the land and another $1,000,000 for the equipment and other non-real estate assets. The judge also found that the quarry is not reasonably suited for residential or agricultural use and that its highest and best use, "and indeed its only reasonable use," is as a stone quarry.
Warren Township has a present estimated population of about 10,000; in 1980 its population is expected to be about 17,000. Within a radius of one-half mile from the quarry there are about 130 homes, a population of about 550-600 and one school. The estimated number of school children within that one-half mile radius is 275, and within one mile of the quarry an estimated 600 children. Within 2,000 feet of the quarry there are approximately 100 homes and 175 school children.
Considerable attention was given to the problem of dust and noise emissions from normal quarry operations because some of the challenged provisions of the ordinance were designed to minimize these factors. Since the portions of the ordinance dealing with dust control are no longer in dispute by representation of counsel, there is no need to discuss these factors in detail. Noise emissions do, however, continue to provide the basis for the attempt to regulate hours and days of operation and therefore continue as a relevant consideration on this appeal. The trial judge concluded that the operation of the quarry did not constitute a nuisance, although such a finding was, strictly speaking, *114 irrelevant to the issues presented. He also found that the levels of dust and noise emissions have not increased since Moore v. Bridgewater Tp., supra, decided in 1961. The court there, too, held the operations not to constitute a nuisance.
The trial judge noted that operation of the Dock Watch quarry is necessarily, by the very nature of the business, attended by the emission of noise and dust which causes some "comparatively minor annoyance" to surrounding residences within a distance of 1,000 and perhaps up to 2,000 feet. The judge accepted the testimony of Dock Watch's planning expert with respect to noise as being the most credible. Close to the quarry he characterized the noise emanating therefrom as very loud and similar to the constant passing of a railroad train. (This judge on a visit to the premises found this characterization accurate.) He testified that at more distant locations the noise level was similar to the sound of distant heavy highway traffic, and that at about 1,400 feet the noise was almost completely inaudible.

II
Before venturing into a consideration of the ordinance's validity, we will first address Dock Watch's challenge to the legislation redrawing the boundary line. As previously noted, this boundary line had long been in dispute and the administrative and legal difficulties of dealing with a quarry in two municipalities became manifest. See Moore v. Bridgewater Tp., supra. The assailed legislation accorded with the desires of both affected municipalities. The reason for the quarry's challenge to this boundary line change lies in the fact that it resulted in placing the quarry in Warren Township and thus subject to that municipality's more restrictive regulatory ordinance, while leaving the Houdaille quarry, Dock Watch's chief competitor, subject to the less restrictive ordinance of Bridgewater Township. The quarry admits that had the boundary line change placed it in Bridgewater, it would have had no complaint since *115 then it would have been operating under the same regulatory restrictions as control Houdaille. It suggests that the boundary change was accomplished as part of a conspiracy to drive it out of business. No evidence supports this contention, the trial judge declined to accept it, and we agree.
Dock Watch next contends that the legislation constituted a special law regulating the internal affairs of the municipalities involved, in violation of N.J. Const. (1947), Art. IV, § VII, par. 9, subsec. 13. Although any change in existing municipal boundary lines may certainly be said to affect the internal affairs of the municipalities concerned, it may not be said to "regulate" them. See Miller v. Greenwalt, 64 N.J.L. 197, 199 (Sup. Ct. 1899), aff'd 64 N.J.L. 722 (E. & A. 1900) wherein an earlier but similar constitutional provision was so construed. See also, Botkin v. Westwood, 52 N.J. Super. 416, 433 (App. Div. 1958), app. dism. 28 N.J. 218 (1958).
Dock Watch's contention that the statute deprived the citizens of Bridgewater of equal protection of the laws is also without merit. Neither Bridgewater nor its citizens have challenged this boundary change. Dock Watch lacks standing to make these arguments on behalf of others who do not appear aggrieved. At any rate, the contention that the boundary change violates either federal or state equal protection provisions is without substance, and the trial judge correctly so held. The boundary line change ended the problems associated with long-standing uncertainty with respect to jurisdiction over the quarry. Convenience dictated that the quarry be located entirely in one or the other municipality. The fact that Warren Township was chosen rather than Bridgewater, which Dock Watch preferred, constituted an insufficient basis for the challenge to this enactment.

III
Several broad principles of general import provide the legal backdrop against which the challenge to the provisions *116 of the township ordinance must be considered. There can be little question but that the express grant of general police powers to municipalities (N.J.S.A. 40:48-2) encompasses the authority to enact an ordinance reasonably regulating the business of quarrying. See Cranberry Lake Quarry Co. v. Johnson, 95 N.J. Super. 495, 511-515 (App. Div. 1967), certif. den. 50 N.J. 300 (1967); Fred v. Old Tappan Mayor and Council, 10 N.J. 515, 521 (1952). With respect to the exercise of the police power generally we observe that
* * * The Supreme Court has recognized that the protection of public health through the preservation of the environment is a valid, and indeed primary, objective of the police power. Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852, 855 (1960). Today it cannot possibly be questioned that the preservation of the environment and the protection of ecological values are, without more, sufficient to warrant an exercise of this power. See, for example, Adams v. Shannon, 7 Cal. App.3d 427, 432, 86 Cal. Rptr. 641, 644 (Ct. App. 1970); Garton, Ecology and the Police Power, 16 S.D.L. Rev. 26 (1971). [Hackensack Meadowlands v. Mun. Landfill Auth., 68 N.J. 451, 473 (1975)]
The presumption of reasonableness and validity which attends all municipal enactments (Collingswood v. Ringgold, 66 N.J. 350, 358 (1975); Moyant v. Paramus, 30 N.J. 528, 534 (1959)) can only be overcome by clear and compelling evidence demonstrating its unreasonableness. The burden of proof in that regard rests upon the party assailing the validity thereof. Rudderow v. Mt. Laurel Tp. Comm., 121 N.J. Super. 409, 415 (App. Div. 1972). The court's role in reviewing ordinances is narrow and limited. We do not judge the wisdom thereof, but act only if the presumption of its validity is overcome by an affirmative showing of unreasonableness or arbitrariness. If the issue is debatable, the ordinance must be upheld. Kozesnik v. Montgomery Tp., 24 N.J. 154, 167 (1957).

IV
Although the foregoing principles have attained axiomatic status, they do not purport to deal with the central *117 legal issue projected by this case: the extent to which a municipality, through the exercise of the police power, may regulate a business which endangers the environment and adversely affects the health and safety of the community notwithstanding the business' status as a nonconforming use under N.J.S.A. 40:55-48. Dock Watch's quarrying operation was declared a nonconforming use and it was permitted to extract materials to its boundary lines. Moore v. Bridgewater Tp., supra. The challenged ordinance regulates the operation of the quarry. The regulations prohibit quarrying below the grade of the adjacent roadway or within a 50-foot buffer zone measured from the outer perimeter of its property. However, although the fact that the quarry is a nonconforming use may protect it from later zoning restrictions, its status as such does not render it immune from reasonable regulations pursuant to the police power in the interest of the public health, welfare and safety. Nonconforming uses are clearly subject to such police power regulations, including those designed for the preservation of the environment and the protection of ecological values. See Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); Cranberry Lake Quarry Co. v. Johnson, supra, 95 N.J. Super. at 523; Shaw v. Byram Tp., 86 N.J. Super. 598, 604 (App. Div. 1965), certif. den. 45 N.J. 35 (1965); Town of North Hempstead v. Colonial Sand & G. Co., 14 Misc.2d 727, 178 N.Y.S.2d 579, 583 (Sup. Ct. 1958); Lizza & Sons v. Town of Hempstead, 19 Misc.2d 403, 69 N.Y.S.2d 296, 298 (Sup. Ct. 1947), aff'd 272 App. Div. 921, 71 N.Y.S.2d 14 (App. Div. 1947). See also 2 Anderson, American Law of Zoning, § 11.66 (1968).

V
The challenged provisions of the quarrying ordinance stricken or modified by the trial judge, from which action the township takes the present appeal, concern (A) requirements *118 of site reclamation, and posting of a bond assuring performance of such reclamation requirements; (B) restrictions on hours of operation; (C) restrictions on days of operation; (D) restrictions on quarrying below grade of adjoining property and road, and within a 50-foot buffer area; (E) limitation of area on which quarry products and equipment may be stored; (F) regulations as to how and when blasting is to be conducted, and (G) the requirement for the planting of landscape screening. The details of these regulations and the facts specifically relevant to a determination of their validity will be dealt with as each such provision is considered below.

A

REQUIREMENTS OF SITE RECLAMATION AND POSTING OF PERFORMANCE BOND THEREFOR.
The trial judge invalidated §§ 4-5.5 and 4-5.6 of the revised quarry ordinance. These sections provide generally for the reclamation of the land affected by the quarry operations during and after termination of such operations and require the operator to post a performance bond to assure reclamation. Section 4-5.5 requires the quarry operator to submit a plan for reclamation of the site so that the land is restored to a productive use consistent with the master plan adopted by the Planning Board of the Township. Provision is to be made, wherever practical, for the grading of all slopes to a rolling topography not to exceed 45° , and after the effective date of the ordinance ultimate quarry faces sloping in excess of 45° are to be benched at heights not exceeding 50 feet. Topsoil which has been removed is to be set aside and retained on the premises for redistribution over the premises, and where replacement of topsoil is impractical, rootable plant materials are to be planted to prevent erosion. Provision is to be made for adequate drainage during and after the quarrying operations, for lateral support slopes and grades abutting streets *119 and lands, and for the use of the premises and surrounding areas after the operation has terminated. Section 4-5.6 requires a performance bond in an amount to be approved by the township but in no event to exceed 1% of the highest annual gross sales of quarry material over the preceding six-year period. The trial judge found these sections of the ordinance to be vague and penal in nature, arbitrary and unreasonable, and not justifiable exercises of the police power by the township. He also held that these sections constituted ex post facto laws and declared them null and void. We disagree.
We are entirely satisfied that the reclamation provisions of the revised quarry ordinance (including the definitions of "Reclamation" and "Reclamation Plan" contained in §§ 4-5.2(e) and (f)) constituted a proper exercise by the township of its police powers in order to protect and preserve the public health, safety and welfare, including the environment and ecology of the area. As Chief Justice Vanderbilt so appropriately declared in Fred v. Old Tappan Mayor and Council, supra, in upholding the validity of a municipal ordinance regulating the removal of soil from lands within its confines:
Plainly, therefore, R.S. 40:48-2 must be considered as an express grant of broad general police powers to municipalities. Such an interpretation of this statute, it is to be noted, is in keeping with other broad grants of powers to municipalities, as for example, R.S. 40:72-3 (powers of municipalities having commission form of government); R.S. 40:116-8 (powers of municipalities governed by boards of commissioners) and R.S. 40:55-32 (zoning powers). As the law now stands any municipality, in addition to any powers elsewhere more specifically granted, has authority by virtue of R.S. 40:48-2 to take such action "as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and general welfare of the municipality and its inhabitants," subject only to the limitation that such action not be prohibited by or inconsistent with the Constitution or the other statutes.
There can be little question but that this broad grant of police powers to a municipality encompasses the authority to enact an ordinance regulating the removal of soil. Both common knowledge and the evidence adduced before the trial court indicate that such *120 an ordinance not only may be desirable but necessary for the protection of property and the preservation of the public health and welfare of a municipality. In the defendant borough the removal of soil has for years constituted a serious problem. At least four property owners have stripped their lands and sold the soil leaving pits of considerable depth. Land thus denuded and deformed casts a blight on all the surrounding area: water collects and affords breeding places for mosquitos, drainage and erosion problems arise, normal vegetation cannot grow but noxious weeds thrive. In short, the land itself is not only rendered useless for all normal uses, but the value of other lands in the vicinity is substantially reduced and the residents of the area generally are subjected to unhealthy, annoying and unsightly conditions. [10 N.J. 520-521]
and further stated:
Aside from section 5 of the ordinance we have no hesitancy in saying that it is reasonably designed to deal with the problem at hand and thereby to protect property and preserve the health and general welfare of the community. Section 5 which prohibits altogether the removal of the top six inches of soil at first blush causes some concern. At the trial, however, there was evidence to show that the so-called top soil in the community extended to a depth of ten to twelve inches and uncontradicted expert testimony to the effect that it took nature 1,000 years to produce a single inch of such soil. It appears, moreover, that top soil is the best and most fertile of soils and has water absorbing and retaining qualities not to be found in the lower strata of soil. In the light of the evidence before us we are inclined to the view that the prohibition against removing the top six inches of soil is not arbitrary and unreasonable. In this view we are not alone, for other states have held such a prohibition valid. Lizza & Sons v. Town of Hempstead, 19 Misc.2d 403, 69 N.Y.S.2d 296 (Sup. Ct. 1946), affirmed 272 App. Div. 921, 71 N.Y.S.2d 14 (App. Div. 1947); Town of Burlington v. Dunn, 318 Mass. 216, 61 N.E.2d 243, 168 A.L.R. 1181 (Sup. Jud. Ct. 1945), certiorari denied, 326 U.S. 739, 66 S.Ct. 51, 90 L.Ed. 441. [at 523-524]
See also, Farmington River Co. v. Town Plan and Zoning Comm'n, 25 Conn. Super. 125, 197 A.2d 653, 658-660 (Sup. Ct. Err. 1963); People v. Gerus, 19 Misc.2d 389, 69 N.Y.S.2d 283, 294 (Cty. Ct. 1942).
We are also satisfied that the reclamation provisions of the ordinance are not vague, arbitrary or unreasonable and that compliance therewith does not impose an onerous, harsh or unreasonable burden upon the owner and operator of the quarry.
*121 Furthermore, the reclamation provisions do not constitute ex post facto laws in violation of N.J. Const. (1947), Art. IV, § VII, par. 3. They do not purport to impose any penalty for any prior violations. See Meadowlands Reg. Dev. Agency v. State, 112 N.J. Super. 89, 124 (Ch. Div. 1970), aff'd 63 N.J. 35 (1973); State v. Donato, 106 N.J.L. 397, 403 (E. & A. 1930); Lindsley v. Bd. of Managers, &c., State Prison, 107 N.J.L. 51, 55-56 (Sup. Ct. 1930), aff'd o.b. 108 N.J.L. 415 (E. & A. 1932); 16A C.J.S. Constitutional Law § 435 at 139. The reclamation provisions only require that the owners and operators of quarries in the future take specific steps during and following termination of the quarrying operations.
Finally, we find no merit in the claim that the posting of a performance bond in an amount to be approved by the township committee, but in no event to exceed 1% of the highest annual gross sales of the quarry over the preceding six-year period, is unreasonable, arbitrary or unduly burdensome. The obvious purpose of the provision is to insure that on termination of the operations and abandonment of the quarry the land will be left in a safe, attractive and useful condition. This is clearly in the interest of public safety and general welfare. A bond sufficient in amount to cover the cost of the reclamation of the quarry is not unreasonable. As a matter of fact, based upon the representations of counsel at oral argument, the principal sum of the bond would not exceed $10,000. See 4 Anderson, American Law of Zoning, § 27.42 at 265 (1968).
Accordingly, §§ 4-5.5 and 4-5.6 (including §§ 4-5.2 (e) and (f)) are valid and enforceable.

B

RESTRICTIONS ON HOURS OF OPERATION
Section 4-5.9(a) of the ordinance confines the hours of quarrying between 7:15 a.m. and 6:30 p.m., prevailing time, and further provides that quarrying shall not be conducted *122 in excess of nine gross hours a day. Justification for this provision of the ordinance was based on the need to afford neighboring residents some respite from truck and quarry noise to protect their health, welfare and safety.
The trial judge invalidated this provision as being unnecessary to the protection of town residents and unduly oppressive in its adverse impact on the operations of the quarry, stating in part:
Plaintiff's business is competitive. As to [sic] customary in the quarrying business it does not truck its product to its consumers which service is performed by private contractors. Its New Jersey competitors, mainly Houdaille Quarry in Bridgewater Township and Trap Rock Industries in Somerset County are not similarly restricted. Contractors who purchase the material seek to obtain it early in the day. Contract truckers are reluctant to truck for a quarry with a late starting hour in the morning, as they thereby lose the opportunity to deliver one more load daily. These circumstances are detrimental to plaintiff and the end does not justify the means. The same is true of the prohibition against operation on Saturday. Competing quarries operate on Saturdays and there is no justifiable reason for prohibiting quarry operations in Warren Township on Saturday.
The judge concluded that the testimony as to the alleged detrimental effects upon the neighboring residents had failed to establish the necessity for such restrictions and that the quarry had carried its burden of establishing the substantial detriment to its business which would be incurred by enforcement of this section of the ordinance.
We note that ample evidence supports these conclusions. Although a municipality possesses power to adopt regulations restricting the hours of operation of a given business that presents "a clear danger to the public health or safety or both," (Fasino v. Montvale Mayor and Council, 122 N.J. Super. 304, 309 (Law Div. 1973), aff'd o.b. 129 N.J. Super. 461 (App. Div. 1973)), such a restriction in order to be valid must find justification in its reasonableness and necessity. In this case, the trial judge concluded on the basis of the evidence adduced that no such justification was *123 shown. He accepted the evidence on behalf of the quarry that enforcement of the restrictions as to hours and days of operation would put the quarry at such a competitive disadvantage as to imperil the continued operation of the business.
In Houdaille Constr. Materials, Inc. v. Tewksbury Tp. Bd. of Adj., 92 N.J. Super. 293 (App. Div. 1966), a condition to the grant of a special use permit under a zoning ordinance limiting hours of operation of the proposed bituminous concrete plant to between 8 a.m. and 5 p.m. was invalidated as being arbitrary, the court noting that the applicant had shown circumstances in which business conditions peculiar to this industry compelled commencement of operations prior to 8 a.m. or subsequent to 5 p.m. Had the ordinance merely imposed a reasonable gross hour limitation per day, the result might well have been otherwise. On the other hand, in Cranberry Lake Quarry Co. v. Johnson, supra, the court upheld an ordinance limiting the hours of operation of a quarry to 8 a.m. through 5 p.m., Mondays through Fridays, concluding that the quarry had not demonstrated the prescribed hours to have been unreasonably restricting "in light of the nature of quarrying operations." 95 N.J. Super. at 512.
In this case the trial judge found that Dock Watch had demonstrated the unreasonably restrictive nature of the regulation in light of the competitive demands of its operation. Substantial evidence supports that finding, and we therefore affirm the conclusion reached. The gross hourly limitation of daily operation to nine hours set forth in § 4-5.9(a) 1 is not, however, in our view arbitrary and will stand.

C

OPERATION ON SUNDAYS AND LEGAL HOLIDAYS
The trial judge upheld § 4-5.9(a) (3) of the ordinance prohibiting quarrying on legal holidays and Sundays, *124 concluding that the restrictions contained therein were reasonable under all of the circumstances. Dock Watch cross-appeals from this ruling. We agree with the trial court that the prohibition against quarrying on Sundays is not arbitrary or unreasonable, and uphold such ruling. We are constrained to disagree with the trial judge with respect to the prohibition as to legal holidays because the township was without power to impose that restriction.
N.J.S.A. 36:1-2 provides:
Any person or corporation may transact either private or public business in this state on any designated holiday or half holiday, in the same manner as on any other day of the week on which it is lawful to transact such business.
In Paramus v. Martin Paint Stores, 121 N.J. Super. 595 (Cty. Ct. 1972), app. dism., 128 N.J. Super. 138 (App. Div. 1974), an ordinance requiring most businesses to close on legal holidays was challenged as invalid. The issue, as framed by the court, was "whether N.J.S.A. 36:1-2 declares a state policy which preempts any conflicting municipal action under the Home Rule Act, N.J.S.A. 40:48-1 et. seq." (at 597). The borough contended, in substance, that the broad grant of authority to enact measures in furtherance of the public health, welfare and safety provided the basis for upholding the ordinance. The trial judge disagreed, and although the appeal was dismissed, the Appellate Division expressed its agreement with that holding. See also, Elizabeth v. Windsor-Fifth Avenue, 31 N.J. Super. 187 (App. Div. 1954). But cf. Houdaille Constr. Materials Inc. v. Tewksbury Tp. Bd. of Adj., supra, 92 N.J. Super. at 302.
We conclude that N.J.S.A. 36:1-2 withdraws power from municipalities to prohibit the transaction of business on a legal holiday and accordingly hold this portion of § 4-5.9 of the ordinance invalid.

*125 D

RESTRICTIONS ON QUARRYING BELOW GRADE OF ADJOINING PROPERTY AND ROAD AND WITHIN A 50 FOOT BUFFER AREA.

The trial judge invalidated § 4-5.9(d) of the ordinance which provides:
No quarrying shall be permitted which will reduce the quarried area below the lowest grade of adjoining properties or roads, nor shall any quarrying be permitted which will endanger the lateral support of abutting properties. In the event quarrying or excavation should result in face slopes in excess of forty-five (45) degrees, a minimum leveled (or natural) buffer area of fifty (50) feet shall be provided between any quarry boundary line and the commencement of said slope.
We are convinced from our study of the entire record that this section of the ordinance is not arbitrary or unreasonable and that the judge erred in declaring it void. Moreover, we do not agree with the judge's conclusion that Dock Watch "is entitled to quarry to an unlimited depth on its land." The rights inherent in private ownership of property must under certain circumstances and to some degree give way to the greater interest and good of the public. The interest in protecting the public health, safety and general welfare is paramount and includes protection of the environment as well as ecological values. It is obvious, and the record amply demonstrates, that if Dock Watch were permitted to quarry below grade "to an unlimited depth" a crater will be left when its operation is eventually abandoned. The hazards and dangers attendant such condition on the land are well known and of considerable concern. If the crater eventually fills with water, as it undoubtedly will, it will cause environmental damage such as pollution of the underground water supply and adjoining streams. Equally important are the aesthetic considerations which are involved in the quarry operation. Such operation, much like the strip mining operations in other sections of our country, scars the *126 land in addition to causing other environmental damage such as air and water pollution. In our view these factors are sufficient justification for the enactment of preventive measures such as § 4-5.9(d). Cf. Goldblatt v. Town of Hempstead, supra; Farmington River Co. v. Town Plan and Zoning Comm'n, supra.
While we recognize that the prohibition against quarrying below grade will limit substantially the amount of material that Dock Watch may extract from its land, the welfare of the community should not be sacrificed for the purpose of permitting Dock Watch the most profitable use of that land. See Monmouth Lumber Co. v. Ocean Tp., 9 N.J. 64, 78 (1952). We are convinced that in the circumstances this restriction is not arbitrary and unreasonable. Counsel conceded at oral argument that Dock Watch will not be forced out of business as a result, and that there is still left to be quarried substantial quantities of material above grade.
The trial judge also erred in concluding that the 50-foot buffer area required in the event that quarrying should result in face slopes in excess of 45° is unreasonable, unduly oppressive and confiscatory. The purpose of this provision, in part, is to provide lateral support to the abutting property. It is not, in our view, an answer that any damage to the lateral support of the adjoining property caused by sloughing or breaking away of the slope of the quarry face is compensable. This ignores the overriding need to protect our environment and ecology. Moreover, Dock Watch has not demonstrated that the township's requirement of a 50-foot buffer zone rather than a 25-foot buffer zone mandated by the Commissioner of Labor and Industry pursuant to Rule 30.1.13 of "Safety Regulation No. 12 Governing Pits and Quarries" (now embodied in N.J.A.C. 12:185-30.1.13) is unreasonable.
Furthermore, in upholding the validity of § 4-5.9 (d) we reject Dock Watch's claim that this section is invalid by reason of preemption of the subject matter by the State *127 through enactment of the Mine Safety Act (N.J.S.A. 34:6-98.1 et. seq.) and the regulations promulgated by the Commissioner of Labor and Industry pursuant thereto. We are in agreement with the trial judge that the Mine Safety Act has not foreclosed the township from regulating quarries so long as its regulation does not conflict with the state policy. See Cranberry Lake Quarry Co. v. Johnson, supra. See also, Masters-Jersey, Inc. v. Paramus, 32 N.J. 296 (1960). In this regard we hold that the 50-foot buffer zone required by the township, though more stringent than the 25-foot zone mandated by the Commissioner, does not contradict the over-all legislative policy and is not preempted by the Mine Safety Act and the Safety Regulations Governing Pits and Quarries promulgated thereunder. See Chester Tp. v. Panicucci, 62 N.J. 94, 102 (1973). Accordingly, § 4-5.9(d) is valid and enforceable.

E

LIMITATION OF AREA ON WHICH QUARRY PRODUCTS AND EQUIPMENT MAY BE STORED.
Section 4-5.9(e) provides:
In no case shall any quarry products, equipment or other materials be deposited or stored on any property, public or private, other than the licensed premises. No buildings, equipment, quarry products or other materials shall be erected or stored within a distance of fifty (50) feet of any quarry boundary line.
The trial judge found no legal justification for this section of the ordinance and declared it unconstitutional. He held that aesthetic considerations do not justify an exercise of the police power, citing Passaic v. Paterson Bill Posting Co., 72 N.J.L. 285 (E. & A. 1905). Such a restricted view of the police power is no longer warranted. In Livingston Tp. v. Marchev, 85 N.J. Super. 428 (App. Div. 1964), certif. den. 44 N.J. 412 (1965), app. dism. 382 U.S. 201, 86 S.Ct. 393, 15 L.Ed.2d 269 (1965), we upheld a municipal *128 ordinance which prohibited the parking of trailers or camp cars within the limits of the township for aesthetic reasons, stating:
Moreover, current authorities recognize neighborhood aesthetics to be integrally bound to property values and to be relevant considerations in zoning when they bear in a substantial way upon land utilization. United Advertising Corp. v. Borough of Metuchen, 42 N.J. 1, 6 (1964); Vickers v. Tp. Com. of Gloucester Tp., supra, 37 N.J. [232], at pp. 247-248; N.Y. Central R.R. v. Borough of Ridgefield, 84 N.J. Super. 85, 93 (App. Div. 1964). Vide "Zoning, Aesthetics, and the First Amendment," 64 Colum. L. Rev. 81 (1964); Agnor, "Beauty Begins a Comeback: Aesthetic Considerations in Zoning," 11 J. Pub. L. 260 (1962). Municipal zoning legislation is one branch of the State's broad regulatory police power. Schmidt v. Board of Adjustment, Newark, supra, 9 N.J. [405], at p. 414. Thus, if an objectionable use, such as here involved, may be prohibited under the zoning statute, a fortiori it may be barred by the municipality under the statute vesting it with general regulatory police power. See R.S. 40:48-2; Napierkowski v. Gloucester Tp., 29 N.J. 481, 496 (1959); Fred v. Mayor, etc., of Old Tappan, supra, 10 N.J., at pp. 520-521. [at 433]
The broad grant of police power clearly encompasses the authority to regulate not only harmful but also unsightly conditions resulting from the quarrying operations. See Fred v. Old Tappan Mayor and Council, supra. Section 4-5.9(e) is valid and enforceable.

F

REGULATION AS TO HOW AND WHEN BLASTING IS TO BE CONDUCTED.
Section 4-5.9(g), provides, in pertinent part:
On each occasion when blasting is to be conducted, written or verbal notice shall be communicated to the Police Department of the Township at least one half hour prior to the proposed detonation. An appropriate warning signal shall be sounded within a time period of one minute of the proposed blast and shall be of such intensity as to be audible to all dwellings located within a distance of 2,000 feet from the perimeter of the licensed premises. To the extent practicable, all blasting shall be limited to the hours between 10:00 a.m. and 12:00 noon, prevailing time. * * *
*129 The trial judge properly declared this section invalid by reason of the preemption of the subject matter of explosives by the State.
* * * N.J.S.A. 21:1A-39 (State Explosives Act) * * * gives the State exclusive jurisdiction over the regulation and use of explosives, the state act to supersede "any existing ordinance, by-law or resolution of any municipality or other governmental subdivision pertaining to the manufacture, sale, transportation, storage or use of explosives." [Cranberry Lake Quarry Co. v. Johnson, supra at 95 N.J. Super. at 511]
Accordingly, § 4-5.9(j) is invalid and unenforceable.

G

REQUIREMENT OF LANDSCAPE SCREENING.
Section 4-5.9(j) provides:
Wherever the licensed premises abuts a public street or road, a solid and continuous landscape screen shall be planted and maintained. Said landscaping shall consist of massed evergreen and deciduous trees and shrubs of such species of density as will provide a solid and continuous screen throughout the full course of the year.
The trial judge found that this section of the ordinance was enacted solely for aesthetic reasons, and that "it was nothing more than an invalid attempt to impose a pure zoning ordinance upon a prior nonconforming use." We disagree. As we pointed out above, even though Dock Watch has the status of a nonconforming use, it is not protected against public health regulations. This ordinance was enacted by the township in an effort to regulate the quarry and to protect the public against the annoying and unsightly conditions created by its operation. The fact that it involved consideration of aesthetic values does not render it void.
Accordingly, we hold that § 4-5.9(j) is a valid exercise of the municipal police power and thus will be permitted to stand.

*130 VI
By way of recapitulation we declare valid and enforceable §§ 4-5.5, 4-5.6, including §§ 4-5.2(e) and (f), 4-5.9(d), 4-5.9(e) and 4-5.9(j) of the Warren Township ordinance. We declare invalid and unenforceable § 4-5.9(a) (to the extent that it restricts quarrying operations between 7:15 A.M. and 6:30 P.M. and on Saturdays), 4-5.9 (a) (3) (to the extent that it prohibits quarrying on legal holidays) and 4-5.9(g). Accordingly, the judgment of the Chancery Division is affirmed in part and reversed in part.
MORGAN, J.A.D. (dissenting).
In upholding those portions of the ordinance prohibiting all excavation below the grade of the adjacent roadway and within an additional 25-foot buffer zone, the court has rendered virtually valueless mineral assets (traprock and shale) which the trial judge found to be worth somewhere between $5,000,000 (the township's figures) and $26,000,000 (plaintiff's figures), representing two thirds of the quarry's unmined assets. Plaintiff's loss, according to the court's opinion, is noncompensable, damnum absque injuria, to be borne by the quarry in deference to the overriding interest of the township in the public welfare and safety of its citizens. In my view the losses inflicted on plaintiff by the sweeping prohibitions contained in this ordinance are out of all proportion to the benefits which may be derived by the few neighboring property owners affected by the quarry, most of whom chose to live in the area with full knowledge of the quarry's presence and its judicially declared right to continue its operation. Clearly, a more reasonable accommodation between plaintiff's right to operate its quarry and the neighboring residents' claim to a quiet, beautiful and safe environment is available without resort to overly broad restrictions on the use of plaintiff's land. The trial judge, after a plenary trial, concluded that, in large part, the challenged ordinance represented an arbitrary and oppressive exercise of the police power: the *131 neighborhood's gains sought by the ordinance could be achieved by less restrictive measures. His conclusion, amply supported by the record, should not be disturbed on appeal by this court.
The ordinance, although drafted to apply generally to all quarries, in fact regulates only plaintiff's quarry, the only quarry in the town, which has been in operation since the early 1920s, first as a permitted and later as a nonconforming use. The trial judge found, and the court's opinion does not seem to dispute, that the highest and best use, and indeed the only use, of plaintiff's land is as a quarry. Its 26 acres are not suitable for residential or agricultural development, and other commercial uses are forbidden by the township's current zoning ordinance which has zoned the property for residential use. Two separate courts reviewing the allegations of surrounding property owners as to the deleterious effects of the functioning quarry have found the quarry not to constitute a nuisance. See Moore v. Bridgewater Tp., 69 N.J. Super. 1 (App. Div. 1961), and the trial court's opinion in this case rendered on August 2, 1973, 12 years later. The trial judge in the present case specifically found that the dust and noise generated by the quarrying operations posed no threat to the health of the surrounding residents or to the values of even those residences closest to the quarry. For example, note was made of the fact that the residence closest to the quarry property, located only 100 feet therefrom, housed a family who had suffered no ill effects from the noise and dust and on selling the house five years after purchase had received almost double the original purchase price.
By and large, the extraordinary reach of this ordinance was sought to be justified by the township, and by this court's opinion, by considerations of safety, aesthetics and ecological balance. Hence, the complete prohibition against quarrying below the grade of the adjacent roadway was said to be made necessary by fear of the body of water, possibly polluted, which would fill the excavated crater. Conceivably, *132 someone might drown in it or drink it. The trial judge, however, noted the easy availability of lesser means to avoid this possible risk, such as the obvious one of fencing the property (the property is already fenced as required by another provision of the ordinance), and concluded, with justification, that the confiscation of many millions of dollars of unmined assets constituted an overreaction to the minimal and hypothetical nature of the perceived danger. Any body of water poses the hazard of an accidental drowning; people can and do drown in natural lakes as well as in private and municipal swimming pools. The ordinary way of avoiding or minimizing such risks is to require the facility to be fenced  not to prohibit pools or drain natural lakes. The perceived danger of water pollution can be controlled by regulations directed to that end specifically, and not by uncompensated  for confiscation.
As noted by the trial judge, quarries are rarely attractive properties. By their very nature they generate noise and dust. The exposed faces of blasted hills and mountains, and the piles of collected and unsold rock together with the equipment to crush it and transport it, rarely please a neighboring resident. A quarry, however, must of necessity quarry where the quarriable material is located; it cannot be moved to a more suitable neighborhood. Moreover, the material produced has social value; the need for housing, low and middle income, is pressing and the cost of building materials necessary to residential housing and business construction should not be unnecessarily inflated by a few local residents' subjective desires for a more attractive environment than the one they bought into.
The reclamation provisions are justified in the majority's opinion almost wholly for aesthetic considerations. Apart from the question of the extent to which aesthetic considerations justify regulation of a nonconforming use, I would have no objection to requiring reclamation of excavated lands in a well-drafted regulation, containing sufficiently definite standards to prevent official overreaching, as a condition to *133 a new assault on virgin land. Here, however, the land was not in a virgin state when the regulation was adopted. The beauty of the quarry was long since destroyed on the effective date of the ordinance. No further quarrying will render the property more unsightly than it already is. The effect of this regulation is, therefore, to require the quarry at its own expense to remedy a condition which, when created, was entirely lawful. It was this factor which gave to the regulation the ex post facto quality condemned by the trial judge  a conclusion with which I agree.
Moreover, the regulation lacks adequate standards preventing abuse. Under it the quarry is required "to the extent practicable," to take steps toward reclamation during the quarrying operation. The quarry is required to make provision for "the preservation of land values and uses of the quarry premises and surrounding areas after quarrying operations have been terminated." Finally, the reclamation plan which must be approved by the township must contain "such other factors that may bear upon or relate to the coordinated, adjusted and harmonious physical development of the Township." These provisions lack adequate standards by which to measure the quarry's compliance therewith and leave the quarry open to continuing and unlimited demands by the township with respect to its duties to reclaim (a realistic consideration in this case in light of the previous efforts of the township to force the quarry out of business). For this reason also, the provisions fail, in my view, to qualify as proper exercise of the police power.
The requirement for a 50-foot buffer zone around the perimeter of the quarry premises in which no quarrying will be permitted was held by the trial judge to be overly restrictive, arbitrary and confiscatory. I must agree. On the basis of the evidence adduced, the judge found that the state requirement of a 25-foot buffer zone was adequate in light of the nature of the material being excavated. The findings are amply supported by substantial evidence in the record and therefore should not be disturbed by us. Here again, *134 the value of the material contained in this buffer area is approximately $6,700,000. About half of that will be lost by enforcing the 25-foot buffer zone mandated by state regulation. Requiring an additional several million dollar loss in the face of an adequately supported trial court finding of no reasonable need therefor is not, in my view, justifiable.
The more minor requirements, such as the planting of a screen of shrubs to protect passing motorists from viewing the unsightly quarry, and the requirement that "no buildings, equipment, quarry products or other materials shall be erected or stored within a distance of fifty (50) feet of any quarry boundary line," are also justified by the majority by aesthetic considerations. Parenthetically, planting the "solid and continuous landscape screen" of "massed evergreen and deciduous trees of such species of density as will provide a solid and continuous screen throughout the full course of the years" would appear sufficient to accomplish the aesthetic purposes which are said to justify both enactments; requiring both the landscape screen and the 50-foot setback for storage of materials and equipment seems entirely unnecessary and oppressive. More fundamental, however, is the issue as to whether purely aesthetic considerations which underlie and supposedly justify these provisions, and to some extent the reclamation provisions as well, constitute a sufficient basis to interfere with a nonconforming use. Fifteen years ago this court in Moore v. Bridgewater Tp., 69 N.J. Super. 1 (App. Div. 1961), declared this quarry to be a nonconforming use immune from later zoning regulations affecting it. Permitting such interference in the guise of a police power regulation on the basis of purely aesthetic considerations trivializes the protection afforded the nonconforming user. Although I do not question the power of a municipality to regulate even a nonconforming use in the interests of public health, safety, and welfare, I take serious issue with permitting such interference with such rights on the more subjective, ephemeral and less necessities policy grounds of aesthetics. If such justification were accepted as *135 sufficient to regulate a nonconforming use, most nonconforming uses, ordinarily discordant with their surroundings, would be disposed of with dispatch.
The plight of the quarry under the ordinance for the most part upheld in the majority opinion is real and compelling and its contours should not be obscured by reference only to the broadly stated legal principles of general application designed only to provide guidance to solutions without themselves supplying answers. The plaintiff quarry is in a competitive business. Its chief competitor is the larger Houdaille facility in neighboring Bridgewater Township which operates unrestricted by municipal regulations, subject only to state regulations which control all quarries in the State. Dock Watch, a much smaller operation, now finds itself competitively hampered by not having to comply with considerably detailed state regulation, but also with the regulations of the ordinance under challenge. It fears, with justification, the results of this artificially created competitive disadvantage, but more importantly, resists confiscation of almost two thirds of its unmined assets, mandated by several of the key sections of this ordinance.
Again, I agree with the majority that nonconforming uses are subject to reasonable regulation in the interest of the public health, welfare and safety. Nonconforming uses should be no more immune from such regulation than are uses which comply with current zoning patterns. The question presented here does not concern the existence of this power but with the manner in which it was exercised in the context of this case. The issue is one of fact, reasonableness, and concerns the need for regulation, the relative benefits to be derived therefrom and the loss to be suffered by the quarry in complying with the restrictions imposed. The trial judge concluded that the need for the regulations was minimal, if not in some cases nonexistent; the quarry's loss would be confiscatory and out of all proportion to any gain sought, and accordingly condemned portions of the ordinance as being unnecessarily oppressive and arbitrary. The evidence in *136 support of these conclusions was ample, and I perceive no basis upon which to disturb it.
For the many reasons well stated by the trial judge in his lengthy oral opinion, I would affirm those portions of it which invalidate the regulations categorically prohibiting excavation below grade, prohibiting excavation within a 50-foot rather than a 25-foot buffer zone around the perimeter of the quarry, requiring a plan for reclamation together with a bond insuring performance of the plan, requiring the planting of a landscape screen, and requiring a 50-foot setback for equipment, buildings and materials. I agree with the majority in its disposition of the boundary line dispute, and its ruling concerning the limitations on days and hours of work.
NOTES
[1] The September 1974 amendment (Ordinance No. 74-23) to the Warren Township Ordinance No. 69-8 was enacted while appeal from the original judgment of the trial court was pending. We therefore in an unreported opinion remanded the matter to the trial court for a supplementary hearing and review of Dock Watch's claims of invalidity in the light of the existing ordinance and retained jurisdiction. See Oakwood at Madison v. Madison Tp., 128 N.J. Super. 438, 439-440 (Law Div. 1974).