SPRING LAKE HOTEL AND GUEST HOUSE ASSOCIATION, NELSON A. CAMP, ALICE BRAMHALL, RALPH DAVINO, MICHAEL INGINO, AND PAUL SCIURBA, PLAINTIFFS-APPELLANTS, v. BOROUGH OF SPRING LAKE, MAYOR AND COUNCIL OF BOROUGH OF SPRING LAKE, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 3, 1984—Decided March 5, 1985.

---

[1]While the New Jersey Automobile Freedom of Choice and Cost Containment Act of 1984 was to take effect October 4, 1983, section 8 of the Act dealing with PIP arbitration remained inoperative until January 1, 1984.

Before Judges KING, DEIGHAN and BILDER.

*Charles R. Parker* argued the cause for plaintiff-appellants (*Sonnenblick, Parker & Selvers*, attorneys; *Charles R. Parker* and *Raymond A. Hayser*, on the brief).

*Frank E. Heine* argued the cause for defendants-respondents (*Heine and Murray*, attorneys).

The opinion of the court was delivered

KING, P.J.A.D.

The plaintiffs are an association representing 28 hotel and guest-house keepers of the Borough of Spring Lake and six individual residents and tax paying members of the association. In this law suit they attack a Borough Ordinance dating from 1948 which prohibits all on-street parking, with a few exceptions, between 3 a.m. and 6 a.m. They also contend that even if the ordinance is a valid exercise of the police power, the Borough's past course of conduct should estop enforcement of the ordinance against guests of local hoteliers who park on the street overnight. We conclude that the adoption of the ordinance was a valid exercise of the police power and that the enforcement of the ordinance is not estopped by the Borough's pattern of extending courtesy against enforcement in the past

to the hoteliers' guests. We affirm the judgment in favor of the defendant Borough and Council, substantially for the reasons expressed in the able opinion of Judge Milberg given orally on August 7, 1984. We also dissolve the pending stay against enforcement of the ordinance.

The Borough of Spring Lake was described by the judge as "an upper-middle-class suburban residential community of approximately 2.1 miles, consisting of 27 blocks, north to south, and 1.5 miles, consisting of six blocks, east to west." Spring Lake is bordered by the Atlantic Ocean on the east, the New York and Long Branch Railroad on the west, the Boroughs of Belmar and South Belmar on the north, and the Borough of Sea Girt on the south. The permanent population is about 4,200; the summer population is about 7,500. The land use distribution is

46% —single-family detached residential
27.6%—public, quasi-public and lakes
20% —street network
2% —commercial
3% —hotels and guest houses
1.4% —vacant land.

The 35 hotels and guest houses in Spring Lake are pre-existing nonconforming uses not permitted by the current zoning ordinance. About half of these 35 establishments are open all year; the rest are open only during the summer season, Memorial Day through Labor Day.

Spring Lake has had the ban on overnight parking on the books since 1949. The Borough had enforced the ordinance against violators but also maintained a courtesy system which allowed hotel managers to call the police with the license numbers of guests' cars which could not be accommodated on the hotel premises. These cars were not ticketed. The courtesy system developed over the years because there were more cars than could be accommodated by the off-street parking facilities of some hotels and guest houses. The courtesy system was abolished in July 1983. This law suit ensued.

The original 1949 ordinance prohibited parking overnight (from 3 a.m. to 6 a.m.) everywhere in town except for one block on Morris Street and an area next to the railroad station. Additional on-street over-night parking was provided by Ordinance 10 of 1978 which permitted parking for up to 72 hours, from June 15 through September 15, on a substantial portion of Ocean Avenue. Still more seasonal parking from June through September was provided by Ordinances 6 and 12 of 1984. These spaces were on the east side of Ocean Avenue and along the "Triangle" across from the Shoreham, one of the biggest hotels (108 rooms). These two amendments provided 716 additional on-street overnight parking spaces.

The courtesy system ended following notice on the July 4th weekend of 1984 when about 100 tickets were issued. The record suggests that borough residents complained of lack of enforcement. The judge found that

> The number of cars belonging to the guests of the hotel and guest houses increased to sufficient magnitude that complaints were lodged by Borough residents with the police, seeking enforcement of the parking restrictions.

An acute exacerbating factor was the increase in the number of cars using the courtesy system by about 60 per night when the Shoreham Hotel lost the access to the church parking lot which it had enjoyed in the past. Council President Taylor testified

> Now, what compounded that problem was that the Shoreham lost their parking lot that they were using which forced in anywhere from on a peak 50 to 60 cars more on the street. Well, the police cannot get a list of two or three hundred or a hundred even cars and license plates and go up to every car in town and say well now, is this one on the list or is it not. It just was physically impossible for the police to do it. We also didn't feel that it was fair to the rest of the citizens of the town. If I'm forced to move my cars in and out of my garage and the guy next door to me or down the street because it's a guest house is parking wherever he wants, we didn't feel that that was serving the town in any way and upsetting the citizens so we just felt that there was no easy way to handle it and that we granted relief by opening up the triangle to all-night parking, seven days a week, and we opened up the rest of the beachfront [Ocean Avenue] to take care of the overflow that the hotels or guest houses might have. But our hand was really forced by the numbers.

Paul Pozienza, supervisor of the Public Works Department, and Lieutenant Hurden of the Police Department, supervisor of

the traffic safety bureau, both testified in favor of the overnight parking ban. Pozienza said the ordinance helped his department in snow plowing, street sweeping, painting traffic lines, cleaning up storm debris, leaf removal, and access to underground utilities near the curbs. Some of these activities could be started early in the morning if there are no cars in the way rather than awaiting their removal by 8 a.m. or 9 a.m. The Lieutenant said that the ban helped his department detect "undesirable sleepers," people sleeping in their cars who frequently picked that part of Spring Lake nearest to adjoining Belmar to get a night's rest during the summer season. He said that since the streets were laid out in a gridlike rectilinear fashion an officer on patrol could see "great distances" at night when the streets were clear. He also said that the ordinances discouraged "overly romantic conduct" in parked cars. He observed that the ban helped to reduce vandalism, and that stolen vehicles had been picked up quickly between 3 a.m. and 6 a.m. when left by thieves. The ordinance also deterred leaving junked or disabled cars, long-term parking, and made identification of abandoned cars easier. The Spring Lake planner, Richard Coppola, claimed that the ordinance was necessary and important so that the streets did not become "parking lots" given the "residential complex of the Borough."

The planner for the hoteliers claimed that the Borough could accomplish its desired objectives in other ways. He said the overnight ban would hurt the innkeepers by forcing them to "stack"[1] cars on their properties, to rent fewer rooms, or to require their guests to walk several blocks from their parked cars. The hoteliers generally admitted that they were managing to cope with the parking problem. They also admitted knowing about the ordinance when they started their businesses but claimed legitimate reliance on the continued existence of the courtesy system. Concededly, the hoteliers could not rea-

---

[1]Parking cars tightly so that a car could not be moved without moving those in front or in back.

sonably be expected to buy the small amount of expensive vacant land left in town and try to obtain variances for parking lots, thus expanding their already nonconforming use. Council President Taylor said in contradiction to the alleged hardship of the hoteliers that in the last eight days preceding the July 27 trial the "triangle," which holds 65 cars, was never full in the morning; it had an average of 30 cars with a peak of 55 on Sunday morning. His survey did not reveal parking problems at any particular hotel but did reveal plenty of available overnight spaces on Ocean Avenue.

While there was some dispute in the testimony, the record is far from convincing that the ordinance was "an unreasonable exercise of police power in furtherance of an improper purpose," presumably to drive the public lodgings operated as nonconforming uses by the plaintiffs and the members of the plaintiff association out of town.

■■ Under the broad "police power" municipalities may pass local laws "necessary and proper for the ... order and protection of persons and property and for the preservation of the public health, safety and welfare." *N.J.S.A.* 40:48–2. Under *N.J.S.A.* 39:4–8(c)(1) and (3) municipalities may "prohibit general parking" and "designate time limit parking." Our State Constitution states that any law concerning municipal corporations formed for local government "shall be liberally construed in their favor." It also states that the powers of municipalities include not only those expressly granted but "also those of necessary or fair implication, or incident to powers expressly conferred." *N.J. Const.* (1947), Art. IV, § VII, par. 11. In a decision upholding municipal regulation of off-street parking of trucks our Supreme Court stated the applicable general principles.

> Ordinances, as well as statutes, are accorded a presumption of validity. *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 564 (1975); *Collingswood v. Ringgold,* 66 *N.J.* 350, 358 (1975). The presumption is not irrebutable but it imposes a burden on the party seeking to overturn the ordinance. *Hutton Park Gardens v. West Orange Town Council, supra,* 68

*N.J.* at 564; *Collingswood v. Ringgold, supra,* 66 *N.J.* at 358; *Moyant v. Paramus,* 30 *N.J.* 528, 535 (1959). The presumption may be overcome only by a clear showing that the local ordinance is arbitrary or unreasonable. *Vickers v. Gloucester Tp. Com.,* 37 *N.J.* 232, 242 (1962), *cert.* denied 371 *U.S.* 233, 83 *S.Ct.* 326, 9 *L.Ed.*2d 495 (1963); *Kozensnik v. Montgomery Tp.,* 24 *N.J.* 154, 167 (1957); *Local Bd. of Health, Berkeley Tp. v. Johnson,* 73 *N.J.Super.* 384, 391–392 (App.Div.1962). [*Hudson Circle Servicenter, Inc. v. Kearny,* 70 *N.J.* 289, 298–299 (1976)].

Our scope of review is "narrow." *Vickers v. Twp. Com. of Gloucester Tp. Com.,* 37 *N.J.* 232, 242 (1962). We do not pass upon the wisdom of the ordinance. The plaintiffs to prevail must show "beyond debate" that the parking ban was beyond the police power. *Ibid.* If a debatable issue is presented, we cannot nullify the Borough's "decision that its welfare would be advanced by the action." *Ibid. See Dock Watch Hollow Quarry Pit v. Tp. of Warren,* 142 *N.J.Super.* 103, 117 (App. Div.1976), aff'd 74 *N.J.* 312 (1977), where we also concluded that "aesthetic values" may properly be considered. *Id.,* 142 *N.J.Super.* at 129.

■ Although there is no New Jersey case discussing the point, courts throughout the country have upheld ordinances banning overnight parking as a valid exercise of local power. 7 *McQuillin, Municipal Corporations,* § 24.649 at 711 (3rd ed. 1981): "A ban on overnight parking serves a public purpose and is a reasonable exercise of a municipality's police power." (1984 Cum.Supp.). In *Village of Oak Park v. Flanagan,* 35 *Ill.App.*3d 6, 341 *N.E.*2d 16 (1975), an ordinance banning overnight parking between 2:30 a.m. and 6 a.m. was held to be a reasonable and constitutional exercise of the police power. There was testimony that the ordinance minimized auto thefts, facilitated discovery of stolen vehicles, assisted in crime control, and was "a tremendous value to the residents of Oak Park in terms of snow and leaf removal and street sweeping." 341 *N.E.*2d at 19. *See also Village of Evergreen Park v. Russell,* 102 *Ill.App.*3d 723, 430 *N.E.*2d 587, 588 (1981); *City of East Cleveland v. Palmer,* 40 *Ohio App.*2d 10, 317 *N.E.*2d 246 (1974); *DePace v. Mayor and Council of Wilmington,* 5 *Terry* (44 Del.) 319, 58 *A.*2d 742 (Super.Ct.1948), aff'd 6 *Terry* (45

Del.) 300, 72 *A*.2d 439 (1950) (ordinance justified as assisting crime control and street sweeping at night in City of Wilmington); *Commonwealth v. Dobbins*, 344 *Mass.* 272, 182 *N.E.*2d 123 (1962).

In *State v. Rush*, Me., 324 *A*.2d 748 (1974), the Supreme Judicial Court of Maine upheld an ordinance prohibiting on-street parking between 2 a.m. and 6 a.m. in the City of Portland. The ordinance was challenged as an unconstitutional burden on the citizens requiring them to find off-street parking and a discrimination against low-income residents of high-density neighborhoods. Because the ban was city-wide and apparently uniformly enforced, the Maine high court found no purposeful discrimination and no suspect classifications implicated. The City of Portland's justifications for the overnight ban were to:

1. Facilitate street repairs and cleaning
2. Increase access for fire companies to property abutting streets
3. Improve visibility for nighttime police observation of property abutting streets so as to detect unlawful entries
4. Remove hiding paces for persons who have violated the law
5. Lessen likelihood of automobile larcenies
6. Facilitate snow removal from public streets [324 *A*.2d at 753].

The Maine court noted its role, similar to our's, in reviewing this challenged local legislation.

> This Court is under no obligation, and takes no opportunity, to endorse or criticize the value of specific legislative enactments. We are constrained to examine challenged laws only as to their constitutional validity. The political process and the deliberations of elected representatives are better suited to contend with the complex questions of public policy and competing social interests. We find nothing in the subject ordinance or its enforcement which invades the constitutional rights of the Defendant or exceeds the constitutional authority reposed within the Legislature and statutorily delegated to the municipality. [324 *A*.2d at 757–758].

In his oral decision Judge Milberg reached these conclusions from the evidence presented on the constitutionality of the Spring Lake Ordinance.

> Defendants submit the means employed are a legitimate exercise of police power which is rationally related to the stated goals. Defendants assert the ordinance prevents long-term parking; aids police, fire and first aid protection;

aids traffic flow, particularly in inclement weather; eases identification of unauthorized and suspicious vehicles; prevents undetected long-term parking of disabled and abandoned vehicles; aids detection of stolen vehicles; prohibits overnight sleeping and overly romantic conduct in parked cars; eases snow-plowing and street cleaning and clearing; increases drainage flow; discourages the parking of cars for advertising purposes and increases accessibility to underground utilities (generally located near the curb lines).

Defendants also submit the ordinance generally advances a desire for aesthetic character and appearance of the Borough. Aesthetic values are not an improper consideration in enacting an ordinance. *See Dock Watch, supra* [142 *N.J.Super.* at 129.

After review of all the pleadings and documents on file and the evidence adduced at trial, the Court concludes plaintiffs have failed to satisfy their burden of overcoming the presumption of the validity of the ordinance as amended by the requisite clear and compelling evidence.

Much testimony was elicited regarding whether there exists alternate means to accomplish the specific goals sought to be advanced. It is of no consequence that other regulatory measures which would accomplish the same results are available.

As I've indicated earlier, my function is limited. I'm not to decide the wisdom of the legislative action, nor am I to legislate for them. My function is to determine the validity of their actions standing alone.

I am satisfied the defendants legitimately exercised their police power in enacting and enforcing the ordinance as amended. Even plaintiffs' expert witness, John T. Chadwick, during the direct examination, did not suggest the relationship between the defendants' eight stated goals (as reflected in the report of Lieutenant Russell H. Hurden), and the challenged ordinance was unreasonable.

For example, his testimony was that the detection of people sleeping overnight in cars, the restriction of romantic behavior in cars, the minimization of vandalism and malicious mischief and the deterrence of breaking and entries in the community were police functions. There was no challenge to defendants' position that the ordinance advances these indisputably legitimate police concerns.

Finally, the Court is not satisfied that the parking problem, although present, is as egregious as it is claimed. The amendments to the "traffic ordinance" expanded the availability of overnight parking where and when it was most needed. The fair consideration of the testimony adduced at trial and the map marked J-7 in evidence reflect, at worst, most guests may be compelled to walk one or two blocks, if at all, from where their cars must be parked.

We are satisfied that these findings and conclusions are fully justified on this record and controlling upon us. *Rova Farms Resort v. Investors Ins. Co.,* 65 *N.J.* 474, 483–484 (1974); *State v. Johnson,* 42 *N.J.* 146, 161–162 (1964). At best the issue was

fairly debatable and appropriate for resolution in the political, not the judicial, forum.

Nor are we persuaded that Spring Lake should be estopped from enforcing the ordinance against the patrons of the hotels and guest houses. The judge found the evidence showed that plaintiffs "were cognizant of long-standing parking restrictions when they acquired their hotel and guest house businesses." He also found that defendant, by the amendatory parking ordinance for expanded all-night parking during the summer, "sought to alleviate some of the hardship" on plaintiffs.

The evidence showed that there were about 1200 available rooms in Spring Lake's hotels and guest houses. After the amendatory ordinances of 1978 and 1984 there were 716 legal spaces for overnight parking on the streets of Spring Lake during the summer season. The hotels and guest houses had 442 normal off-street spaces of their own for cars, 702 spaces if the cars were "stacked." We agree with Judge Milberg that the parking problem, although present, was not as "egregious" as was claimed.

Estoppel by conduct is applied sparingly against governmental entities. "The principal of estoppel *in pais* is not, for obvious reasons, given the same freedom of application against the public as against private persons." *Summer Cottagers' Ass'n of Cape May v. City of Cape May*, 19 *N.J.* 493, 503 (1955). We agree with the trial judge and see no equitable considerations in this record compelling the exceptional invocation of the doctrine of estoppel against the Borough's enforcement of this ordinance. *See Skulski v. Nolan*, 68 *N.J.* 179, 198 (1975). An ordinance is not repealed by inaction. *Newark v. Kennedy*, 29 *N.J.* 178, 191 (1959). Here there was "no evidence of a studied policy not to enforce the ordinance." *Id.* at 192. *See also Abrahams v. Civil Service Commission*, 65 *N.J.* 61, 75 (1974). *Cf. Tillberg v. Tp. of Kearny*, 103 *N.J.Super.* 324 (Law Div.1968) (issuance of pool-hall operator's license for 31 straight years estopped Kearney from claiming code violations

and denying renewal). Here the ordinance's enforcement seems to bring at worst a tolerable level of inconvenience to the innkeepers. The judge's ruling does not prevent the operation of any particular business or deprive anyone of a livelihood. Spring Lake's policy was not one of studied unenforcement but a policy of exceptions to a well-known ordinance which exceptions the citizens no longer wished to tolerate when they were apparently fast becoming the rule.

Affirmed. The present stay against enforcement of the ordinance is dissolved.