221 N.J. Super. 148 (1987)
534 A.2d 44
COS-LIN, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
SPRING LAKE BOARD OF ADJUSTMENT, MAYOR AND COUNSEL OF THE BOROUGH OF SPRING LAKE, DEFENDANTS-APPELLANTS, AND MR. & MRS. CLIFFORD C. CARR, JR., BEVERLY CRANE, BARBARA WARD, MR. & MRS. RALPH WEAVER, DR. & MRS. LOUIS ALBRIGHT, HAZEL MCNULTY AND MR. & MRS. ROGER SHARP, INTERVENORS.
No. A-3217-86T8.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1987.
Decided November 18, 1987.
*149 Before Judges KING, GRUCCIO and D'ANNUNZIO.
Thomas E. O'Brien argued the cause for appellant Spring Lake Borough (Bathgate, Wegener, Wouters & Neumann, attorneys; Dominic J. Aprile, on the brief).
Fred G. Stickel, III, argued the cause for appellant Mayor & Council of Spring Lake (Stickel & Koenig, attorneys).
John L. Bonello argued the cause for respondent (Falvo, Bonello, Moriarty & Steiger, attorneys).
The opinion of the court was delivered by KING, P.J.A.D.
The issue here is whether the temporal extension of a seasonal (Memorial Day through Labor Day) restaurant and hotel use in a residential zone to a basically year-round operation *150 is an illegal expansion of a prior, 30-year-old nonconforming use. The Spring Lake Board of Zoning Adjustment ruled against the application for a year-round operation by plaintiff Cos-Lin, Inc. The Law Division judge reversed the Board. We conclude that the proposed extension of this summer seasonal restaurant and hotel use to a substantially year-round operation in the Borough's most restricted residential zone violates the strong public policy expressed in our case law to limit and discourage the extension of nonconforming uses. We reverse the Law Division.

I
The Borough of Spring Lake is an upper-middle-class to upper-class suburban residential community, extending about 2.1 miles, or 27 blocks north to south, and 1.5 miles, or six blocks east to west. Spring Lake is bordered by the Atlantic Ocean on the east, the New York and Long Branch Railroad on the west, the Boroughs of Belmar and South Belmar on the north, and the Borough of Sea Girt on the south. The permanent population is about 4,200 and the summer population is about 7,500. The land distribution is: 46% single-family detached residential, 27.6% public, quasi-public (parks, tennis courts) and lakes, 20% street network, 2% commercial, 3% hotels and guest houses, and 1.4% vacant land. Spring Lake Hotel Ass'n v. Spring Lake, 199 N.J. Super. 201, 204 (App. Div.), certif. den. 101 N.J. 267 (1985). The 35 existing hotels and guest houses are preexisting nonconforming uses, 17 of which have been open only seasonally from Memorial Day to Labor Day. Ibid.
"The Breakers", an old Victorian-style hotel, fronts on the Atlantic Ocean; Ocean Avenue and a boardwalk separate the hotel from the dry sandy beach. The boardwalk is undeveloped, commercially or otherwise. The area around "The Breakers" is zoned R-1, the highest residential zone in the Borough. The hotel's neighborhood is completely residential except for an *151 adjacent 25-room guest house, "The Kenilworth," which also fronts on Ocean Avenue. The houses in the surrounding area ranged in value from $150,000 to $600,000 in 1983-1984. "The Breakers" has 70 rooms and is a four-story structure, about 100 years old.
The Borough's ocean front was originally zoned for hotels in 1929. The area was rezoned R-1 in 1957 when the townspeople recognized the trend from a resort town to essentially a single-family year-round residential community with the advent of the Garden State Parkway and other local highway improvements. The zoning has remained residential during the past 30 years. The town was originally a rural fishing and farming village which developed into a vacation resort during the late 1800's with the onset of railroad accessibility to the New York metropolitan area. The original large beachfront hotels, The Monmouth and the Essex and Sussex, no longer exist. The Monmouth has been demolished and replaced by residences; the Essex and Sussex apparently has been converted to summer seasonal condominiums.
"The Breakers" operated as a hotel with a restaurant for guests and the general public until its sale to the plaintiff Cos-Lin in 1979. Until then the hotel and restaurant had operated only from Memorial Day to Labor Day. After Cos-Lin bought "The Breakers," the restaurant eventually remained open into the fall months, apparently through the end of November, without official approval. In 1983 Cos-Lin's principal, Cosmo Scardino, applied to upgrade the heating capacity for year-round use. This application precipitated the applications to the Board for variance and interpretive relief and then this suit.
The dining room seats about 150 and has about 30 tables. During the off-season months when Scardino hopes to be open, he anticipates serving a minimum of 400 people a week, about 200 of them on Saturday night. He plans to close during January, and apparently part of February, for vacations and *152 renovations. In his testimony of October 24, 1985, Scardino said he planned a "ten and one-half month operation a year." He actually only had seven hotel rooms heated and available for occupancy in the off-season during 1983-1985 when the Board's hearings were held. He anticipated only about a 10% occupancy rate in the hotel through the "off-season" if his application was granted. During the summer season, occupancy of the hotel is essentially 100% and the restaurant is "busy." When Scardino testified in mid-November 1983 he said the "hotel was now closed for the winter" but the restaurant was open. There is no off-street parking available to patrons on "The Breakers" property. There is no liquor license; customers usually bring their own alcoholic beverages.

II
This is the procedural and factual background of this litigation. In 1983 Cos-Lin made an application to David Miller, Spring Lake's construction official, for a building permit to install heating equipment in the dining rooms and hotel rooms in "The Breakers" to facilitate a year-round operation in contrast to the previous Memorial Day to Labor Day operation. After denial of this building permit, Cos-Lin applied to the Board for an interpretation that in essence would have permitted the proposed temporal extension as a de minimis expansion of the pre-existing nonconforming hotel and restaurant use under N.J.S.A. 40:55D-70(b) or for a use variance under N.J.S.A. 40:55D-70(d).[1] The statement of "reason for relief" presented by the applicant said

*153 Applicant is seeking relief from the decision of the building inspector denying a building permit to install heat in the west area of the first floor of the hotel covering between 6,000 and 8,000 square feet, and ultimately, to heat the entire hotel area. It is the position of the applicant that the heating of the hotel is a mere intensification of a legally existing non-conforming use. There is no enlargement of use and no change in the current structure of the premises.
The applicant intends to install a gas-driven base board hot water heating system.
The Board found as a fact that Scardino "candidly testified that on November 17, 1983 the hotel was closed," that the restaurant was open and "that he wanted to operate his facility primarily ... as a restaurant ... on an all year-round basis." The Board also found "as a fact that the restaurant use [and hotel] use have been utilized on a `seasonal basis' from on or about Memorial Day weekend through Labor Day weekend for an extensive period of time ... prior to applicants extending the time of the use commencing in 1983," after it acquired the property. After extensive hearings in late 1983 and early 1984, at which the Board heard testimony from four experts (two for applicant; two for objectors), affected local residents, and Cosmo Scardino for Cos-Lin, the Board denied the request in June 1984.
The Board's resolution of denial specifically relied on our case law on the extension or expansion of nonconforming uses, citing Belleville v. Parrillo's Inc., 83 N.J. 309 (1980); Grundlehner v. Dangler, 29 N.J. 256 (1959), and Hantman v. Randolph Township, 58 N.J. Super. 127 (App.Div. 1959), certif. den. 31 N.J. 550 (1960). The Board specifically found that the "proposed change from a seasonal to an all year-round restaurant constitutes a substantial enlargement or extension of a nonconforming use," would "have a detrimental effect on the neighborhood," and "would substantially impair the Zone Plan." The Board found that the extended restaurant use *154 "adds to pedestrian and vehicular traffic in the residential neighborhood, parking problems, significant inconveniences to the adjoining residential users, i.e., noise, pollution, littering, odors, etc." and that the "deleterious effect" of a restaurant in a residential area should not be aggravated. The Board concluded that "although the hotel probably preexisted all the residences in the area, the residential property owners purchased their homes with the knowledge that the hotel was a seasonal operation and that it would be unfair to these residential users to permit a more intense restaurant operation to be conducted from the site."
Cos-Lin then began this prerogative writ action seeking to set aside the Board's denial of relief. Apparently without objection, on May 30, 1985 the Law Division judge remanded the case to the Board for a decision on an amended application whether plaintiff's plan "to add heat to various hotel rooms and to utilize [them] on an all year-round rather than seasonal basis" and the "plaintiff's request to convert its accessory seasonal hotel restaurant into an all year-round public restaurant" was permissible. In the amended application Cos-Lin requested this relief.
This application is being made pursuant to an Order of the Superior Court of New Jersey dated May 30, 1985 and seeks the following:
(1) to reverse the decision of the Zoning Officer which held that the placement of heat in the hotel rooms and restaurant and its subject operation on a year round basis constitutes an illegal expansion of a non-conforming use; and
(2) in the alternative, for a use variance to enable the aforesaid placement of heat and operation on a year round basis of both the hotel and restaurant.
This application sought relief from § 402 of the local ordinance which does not include hotels and restaurants as a permitted use in any residential zone and § 504B(4) which states in pertinent part on nonconforming uses:
* * * * * * * *
4. No use and no structure containing a non-conforming use shall be enlarged, extended, constructed, reconstructed or structurally altered in any manner without an appeal for variance relief....
*155 After further extensive hearings in late 1985 and early 1986, the requested relief was denied in a detailed 17-page resolution, the Board finding that "the proposed intensification of the hotel restaurant use is substantial rather than insubstantial, ... and would have a deleterious effect upon surrounding residential users living in the highest residential zone in the Borough, ... would have an adverse impact upon the surrounding property values and the quality of life of those living in the neighborhood" and that the essentially unanswered testimony of the neighboring property owners "has shown overwhelmingly that the illegal year-round operation of the dining room alone is a substantial intensification and expansion of a nonconforming use." The Board also rejected Cos-Lin's contention that the "public trust doctrine" encouraging the general public access to the dry sand beaches of this State, see Matthews v. Bay Head Improvement Ass'n., 95 N.J. 306 (1982), should be "expanded to include ... public accommodations [and] restaurants as special reasons for a use variance." N.J.S.A. 40:55D-70(d).
At trial of this prerogative writ, the Law Division judge reviewed the testimony before the Board at both hearings. He affirmed the denial of a use variance application under N.J.S.A. 40:55D-70(d). See Medici v. BPR Co., 107 N.J. 1 (1987). There is no cross-appeal from this ruling. The judge also ruled that the seasonal nonconforming hotel and restaurant use of "The Breakers" was a valid nonconforming use which included the right to operate a year-round public restaurant and hotel, so long as the hotel remained open during the ten and one-half months proposed. He said: "There is an annoyance feature and the annoyance feature is not enough to interpose itself to tilt the balance in this case to favor sustaining the Board in their legal conclusions."

III
A leading land use law authority has recently observed that: "In dealing with proposed changes of nonconforming uses, the *156 courts have divided along the familiar lines." Williams, American Land Planning Law, § 112.02 at 109 (1986). "Those courts which usually show special concern for developers' rights are more likely to step in and permit nonconforming users to change to other nonconforming uses; others tend to follow a stricter policy generally, and normally do not permit proposed changes among nonconforming users." Ibid. Williams notes that New Jersey is one of the states "with the most restrictive judicial policy" towards nonconforming uses. Id. at n. 2; see also § 6.04.
Many decisions give no indication one way or the other of a basic attitude towards nonconforming uses. However, in several important states, the courts have taken the opportunity in such cases to emphasize the general rule against continuation of nonconforming uses; and in those states the decisions generally find a reason not to permit such change. The basic policy in these decisions was announced by a California court in the early days of zoning: "The ultimate purpose, however, is plainly that nonconforming uses or premises shall gradually be eliminated." [Williams, supra § 112.07 at 115 n. 20, citing Sitgreaves v. Board of Adjustment of Town of Nutley, 136 N.J.L. 21, 54 A.2d 451 (Sup.Ct. 1947), and Rupprecht v. Draney, 137 N.J.L. 564, 61 A.2d 220 (Sup.Ct. 1948)].
This attitude of our courts toward nonconforming uses was confirmed in the first leading case on the subject in the modern era, Grundlehner v. Dangler, 29 N.J. 256 (1959). This case involved an application for a 26-foot one-story extension to the building and the expansion of the garage of a funeral parlor located in a residential zone. Over the opposition of neighboring property owners, the Board of Zoning Adjustment and then the Law Division, approved the expansion of the nonconforming use. This court reversed the Law Division and the Supreme Court affirmed the reversal. In refusing to permit the expansion of the nonconforming use the Supreme Court agreed with this court's conclusion that "the burden is on the applicant to prove the insubstantial nature of the construction" and that "[i]f there is any doubt that the construction is of an insubstantial nature," the application must be denied. 51 N.J. Super. 53, 60 (App.Div. 1958). Justice Jacobs, for the Supreme Court related that: "Shortly after the passage of the zoning act our courts stated that the spirit of the law was to restrict nonconforming *157 uses and that while [then-pertinent] R.S. 40:55-48 permitted them to continue as of right it did not permit the enlargement of that right. [Citations omitted]. Since the nonconforming uses were generally discordant to their surroundings it was the fervent hope that they would in time wither and die and be replaced by conforming uses." Grundlehner v. Dangler, 29 N.J. at 263. Justice Jacobs reviewed the pertinent authorities and concluded that "our courts have continued with their application of the doctrine that nonconforming uses may not be enlarged as of right except where the enlargement is so negligible or insubstantial that it does not fairly warrant judicial or administrative notice or interference." Ibid. He concluded the point by stressing that "where there is doubt as to whether the enlargement is substantial, rather than insubstantial, it is to be resolved against the enlargement," id. at 264, citing Heagen v. Borough of Allendale, 42 N.J. Super. 472, 482 (App.Div. 1956) (Clapp, S.J.A.D.) and Martin v. Cestone, 33 N.J. Super. 267, 271 (App.Div. 1954) (Goldmann, S.J.A.D.  "The community's interest in the advancement of its own welfare through the medium of a zoning project is to this extent favored over the individuals' interest in his nonconforming use.").
Shortly after the Grundlehner case, this court considered our state's first case involving a temporal expansion of a nonconforming use in Hantman v. Randolph Twp., 58 N.J. Super. 127 (App.Div. 1959), certif. den. 31 N.J. 550 (1960). This case involved an attempt to extend the use of a summer bungalow colony business use, which was nonconforming in a residential district, into a year-round use. Because the change was substantially deleterious to the community, we affirmed the Law Division's "denial of relief to the plaintiffs applicants" who had sought declaratory relief from the local zoning ordinance.
In Hantman the plaintiffs disputed "the existence of any municipal power to restrict occupancy in terms of a time dimension," id. at 135, as an unconstitutional taking. We *158 rejected this contention stating that "[p]rotection will not be accorded unless the use is substantially the same kind of use as that to which the premises were devoted at the time of the passage of the zoning ordinance." Ibid. We concluded on the legal point presented
Our judgment is that an increase in the time period during which a nonconforming use is operated may justifiably be the basis for a finding of an unlawful extension thereof, just as changes in the functional use of land or increases in the area of use have been. [Id. at 137].
The change from seasonal use, May 1 through September 30, was thus held a "substantial, ... unlawful extension of the nonconforming use." Id. at 138. Hantman has been cited authoritatively in 4 Rathkopf, The Law of Zoning and Planning, § 51.07 at 51-126 n. 100 (1987). The author states:
The exercise of a nonconforming use at seasons of the year additional to those at which that use was exercised at the time of adoption of an ordinance has been held to be an unlawful extension or enlargement of the use. Similarly, an increase in the number of days per week, or hours per day, of operation has been held to be an unlawful extension or enlargement of use, especially where those increased times of operation resulted in quasi-nuisance impacts upon the neighborhood. [Id. § 51.07 at 51-126].
See 8A McQuillan, Municipal Corporations, § 25.206 at 107 n. 24 (3rd ed. 1986), which states: "Extension in point of time, as by conversion of a non-conforming use from seasonal to year-round operation, may also be prohibited," citing Beerwort v. Zoning Bd. of Appeals of Town of Coventry, 144 Conn. 731, 137 A.2d 756 (Sup.Ct.Er. 1958), cited in Hantman, 58 N.J. Super. at 136, and also Weyls v. Zoning Board of Appeals of Town of Trumbull, 161 Conn. 516, 290 A.2d 350 (1971). See also cases collected at 4A Williams, supra, § 113.06 at 164-165 n. 40; 1 Anderson, American Law of Zoning § 6.47 at 465 n. 77 (1976 and Supp.); 6 Powell, Real Property § 871(3)(c) (1987); e.g., Rosbar Co. v. Board of Appeals, 53 N.Y.2d 623, 438 N.Y.S.2d 777, 420 N.E.2d 969 (Ct.App. 1981), aff'g, 77 A.D.2d 568, 429 N.Y.S.2d 910 (App.Div. 1980) (conversion of seasonal summer hotel to year-round facility); Goldman v. Town of Dennis, 375 Mass. 197, 375 N.E.2d 1212, 1214 (Sup.Jud.Ct. 1978) (conversion of summer cottages to condominiums "would encourage expansion of use beyond the short summer season"); Town of Oyster *159 Bay v. Yacht & Cabana Club, 38 A.D.2d 604, 329 N.Y.S.2d 185 (App.Div. 1971) (conversion of seasonal private beach club to year-round public club).
The latest statement of our Supreme Court on nonconforming uses is found in Justice Clifford's opinion in Belleville v. Parrillo's, Inc., 83 N.J. 309 (1980). There the defendant was found guilty of violating a municipal ordinance because it "extended a nonconforming use when it changed its operation from a restaurant to a discotheque without having first obtained approval of the local board of adjustment." Id. at 311-312. The restaurant turned disco was in a B residential zone. The Appellate Division was corrected for erroneously reversing the convictions; Justice Clifford said "the focus in cases such as this must be on the quality, character and intensity of the use, viewed in their totality and with regard to their overall effect on the neighborhood and the zoning plan." Id. at 314 (emphasis supplied). We note with emphasis "the neighborhood" and not the entire municipality as the focus of the Supreme Court's concern. But an entire community can be affected ultimately because applications for conversions of other seasonal commercial uses to year-round uses in residential zones in Spring Lake and similar communities could be prompted by approval of "The Breakers" application and thus affect other neighborhoods and further contribute to the erosion of the integrity of a town's zoning plan.
Justice Clifford adhered to our established doctrine that "[b]ecause nonconforming uses are inconsistent with the objectives of uniform zoning, the courts have required that consistent with the property rights of those affected and with substantial justice, they should be reduced to conformity as quickly as is compatible with justice." 83 N.J. at 315. He reiterated that where there is doubt as to whether a change is substantial, "the courts have consistently declared that it is to be resolved against the enlargement or change." Id. at 316. Noting that courts have "proceeded with a caution approaching suspicion" *160 in this evaluation of whether the change is substantial, he cites seven examples of denials and three of approval. Id. at 316-317. One of the examples of a denial is the Hantman case. The Supreme Court expressly approved our holding in Hantman denying a temporal expansion of a seasonal nonconforming use, stating that Hantman "well illustrates the proper analysis for examining changes in nonconforming uses." Id. at 317. In Belleville the Court, by Justice Clifford, reviewed our holding in Hantman and commented
... Reviewing the facts the court established that the plaintiffs' bungalows were in fact nonconforming uses. It then proceeded to address the question of whether permitting fulltime occupancy would effect a substantial change in the premises. Answering in the affirmative, the court declares, "an increase in the time period during which a nonconforming use is operated may justifiably be the basis for finding an unlawful extension thereof, just as changes in the functional use of the land or increases in the area of use have been." [Hantman, 58 N.J. Super. at 137]. Recognizing that nonconforming uses are disfavored, the Appellate Division emphasized the deleterious effect that year-round operation of the bungalows might have upon the general welfare of the municipality. [83 N.J. at 317-318].
The Supreme Court concluded the analysis by saying: "We fully approve of and adopt the approach and analytical frame-work of the Hantman court," id. at 318.
We here conclude that the Law Division erred in reversing the Board. As all the authorities make clear, the burden of proof on the issue of substantial change is on the applicant and doubts are to be resolved against the enlargement or change. Here the judge appears to have resolved any doubt in favor of the change rather than against it when he said that "the annoyance feature is not enough to interpose itself to tilt the balance in this case to favor sustaining the Board." We conclude that this is not simply a case of "tilting the balance" but a case where the law disapproves the change if any doubt on the issue of substantiality is generated.
Moreover, there was very substantial evidence, basically unrefuted, that this change from summer use, Memorial Day to Labor Day, to ten and one-half months a year, adversely and deleteriously affected this R-1 neighborhood. Public bodies *161 such as this Zoning Board are allowed wide latitude in the exercise of their delegated fact-finding discretion because of their peculiar knowledge of local conditions. Kramer v. Bd. of Adj., Sea Girt, 45 N.J. 268, 296 (1965). We cannot substitute our independent judgment for the Board's in such areas of factual dispute. Here substantial evidence and common sense supported the conclusion that a year-round commercial use like this restaurant is a substantially greater annoyance to people in their neighboring homes than is a seasonal use. In fact, the judge himself said "there will be a deleterious effect on the adjoining owners" from the extension.
Finally, the Law Division judge here seemed to conclude that the extension of the nonconforming use had to be a threat to the "general welfare of the community", not just the neighborhood, before it could be denied. He said that Hantman was decided against the applicants "because of the effect on the municipality not the effect on the neighbors." But in Belleville v. Parrillo's, Inc., where the restaurant was converted to a discotheque, Justice Clifford clearly noted for the Court that the focus must be on the "quality, character and intensity of the use" viewed "with regard to their overall effect on the neighborhood and the zoning plan," 83 N.J. at 314 (emphasis added), and also on whether "the general welfare of the neighborhood has been demonstrably affected," Id. at 318 (emphasis added). We conclude that there was ample credible evidence before the Spring Lake Board to support the denial of the temporal expansion of this nonconforming commercial use in a residential zone and no good or special reason to grant relief. Indeed, the test for the extension of a nonconforming use analytically may be the same test used for grant of a "special reasons" subsection (d) variance. See N.J.S.A. 40:55D-70(d) ("in particular cases and for special reasons" the Board may grant a variance to allow" (1) a restricted use or (2) an expansion of a nonconforming use.")
Reversed.
NOTES
[1] N.J.S.A. 40:55D-70 states in pertinent part

The board of adjustment shall have the power to:
* * * * * * * *
(b) Hear and decide requests for interpretation of the zoning map or ordinance or for decisions upon other special questions upon which such board is authorized to pass by any zoning or official map ordinance, in accordance with this act;
* * * * * * * *
(d) In particular cases and for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, ....